EASLEY, J., for the Court.
¶ 1. On September 13, 1996, the Youth Court Division of the County Court of Forrest County (youth court) entered an order granting temporary custody of S.A.M., the minor daughter of M.M.B. (the mother), to the Forrest County Department of Human Services (FCDHS). Thereafter, the child was placed in the physical custody of Mississippi foster parents, G.S. and S.S. (foster parents). On October 9, 1996, an order was entered pursuant to Miss.Code Ann. § 43-21-451 (2000) authorizing the filing of an abuse petition in the interest of S.A.M. The abuse petition was filed on October 14, 1996.
¶ 2. As a result of the abuse petition, the youth court conducted numerous hearings over the next four years. On February 4, 1997, the mother admitted the allegations contained in the petition, "and S.A.M. was adjudicated abused. The mother was represented by attorney Wade Baine at the adjudicatory hearing. After the youth court conducted a dispositional hearing in the matter, the court ordered on July 2, 1997, that custody of the child be granted to natural father, J.M. (the father). By July 29, 1997, the father had relinquished custody of the child to a fo'ster family in New York where he was living. The child was then placed back into the custody of FCDHS on August 1,1997.
¶ 3. After a youth court review, S.A.M. was placed by order of March 31, 1998, back into the physical custody of the Mississippi foster parents and remained in the legal custody of Mississippi Department of Human Services (DHS).
¶ 4. On July 14, 1998, the mother filed a motion for the court to stand recused. The mother filed a motion for custody of the child or for additional visitation. The youth court entered an order on January 12, 2000, recusing itself, stating:
*1268 [M]uch of the court’s concerns were directed toward the problems of investigation, management and coordination of the DHS-FCS Services. Further, from the onset of this case, a crucial issue for determination of reunification possibilities has always been, who perpetrated the abuse on S.A.M. To this day, there has been no determination on that issue or that the individual, or condition or circumstances for the removal of this child from the mother’s home have been corrected.
After Judge Michael McPhail (Judge McPhail) recused himself on this case, this Court appointed Judge Michael Ward (Judge Ward) to serve as judge.
¶ 5. On March 17, 2000, the youth court convened with Judge Ward presiding and directed that a full transcript of all prior proceedings be prepared and received documents into evidence, instructed the guardian ad-litem, attorney Michael B. McMahan (guardian), to file a report, and invited any of the parties to file responses thereto.[1] The guardian rendered his report and recommendation dated July 31, 2000, to the youth court “based upon a review of approximately 950 pages of trial testimony, over 200 pages of medical records, and other exhibits, and based on personal observations of the [gjuardian [a]d [ljitem during the trial proceedings.” The guardian recommended that the mother’s parental rights should not be terminated, but rather the guardian recommended that the foster parents be granted durable legal custody of the child. On December 18, 2000, Judge Ward rendered judgment in this matter after conducting a review of the full transcript of all prior proceedings, documents, the report filed by the guardian and response thereto.
¶ 6. The youth court granted durable legal custody of the child to the long-time foster parents of the child pursuant to Miss.Code Ann. §§ 43-21-609 & —613, and extinguished the necessity for DHS to oversee and monitor the case and fulfilling the requirement of annual reviews as required under Miss.Code Ann. § 43-21-613. The youth court noted that durable legal custody, however, is not permanent and is subject to modification. The youth court ordered supervised visitation with the mother not to exceed twice a month and not to exceed one hour for each visit. Because of FCDHS’s violations herein and because FCDHS is finally relieved of involvement in a case in which durable legal custody has been granted, the youth court requested the Court Appointed Special Advocates Program (CASA) of Forrest County, Mississippi, to provide the supervision for the visits.
¶ 7. It is from this December 18, 2000, judgment that the mother and the DHS appeal to this Court. In response, the foster parents, the Forrest County Youth Court Prosecutor, Francis T. Zachary (prosecutor), and the guardian filed briefs in support of the youth court’s ruling.

FACTS

¶ 8. This case involves the abuse of the minor female child, referred to as S.A.M. The child’s natural parents were married on September 28, 1994, and separated on November 15, 1994. However, from their relationship, they had one child, namely S.A.M., born on May 2, 1995. The parents were subsequently divorced with the mother being granted sole custody of S.A.M.
¶ 9. While separated, the mother began dating M.H. (the boyfriend). By May of 1996, the mother had moved in with the *1269 boyfriend. The mother became pregnant with the boyfriend’s child while they were living together without benefit of marriage.[2] According to the mother, she and the boyfriend lived together five or six months.
¶ 10. The mother alleges that on September 8, 1996, she heard S.A.M. crying non-stop while she was in another room doing the laundry. According to the boyfriend, he was watching a football game on television. The boyfriend .claims that he picked up S.A.M. and carried her to the mother. At that time, S.A.M. allegedly had a seizure which resulted in S.A.M. being hospitalized and subsequently removed from the mother’s care.
¶ 11. The mother’s initial claim that the sixteenth-month-old child was having a seizure turned into her claiming that she did not have any prior knowledge of any abuse and resulted in a severance of her relationship with the boyfriend. The child was brought to thé Forrest County Hospital on September 8, 1996, for a generalized seizure. The medical tests conducted at the hospital revealed that the child actually had rib fractures of the 7th, 8th and 9th posterior left ribs in various stages of healing; a fracture of the 6th lateral rib, together with a fracture of the right tibia; a right frontal acute subdural hematoma; and retinal hematoma. S.A.M.- was hospitalized September, 8-13, 1996. Surgery was performed on the sixteen-month-old child to remove fluid from her brain.
¶ 12. According to the Forrest County Hospital medical records, the mother gave various explanations to the medical providers for the child’s injuries. She claimed that S.A.M. was in her car seat when they were struck at an intersection approximately half a month earlier., However, S.A.M. was not knocked unconscious and not injured. The mother further claimed that approximately three weeks earlier S.A.M. fell approximately 4jé feet from her crib onto a carpeted floor. The mother says S.A.M. never lost consciousness and received no traumatic injures. The mother also informed Dr. Michael Fromke (Dr. Fromke)-that S.A.M. fractured her right tibia when she fell off the couch chasing her pet cat. However, the bones survey also revealed multiple rib fractures as well as a right tibial fracture.
¶ 13. Dr. Fromke was S.A.M.’s treating neurologist. In his- records, Dr. Fromke noted his medical findings pertinent to S.A.M.’s neurological condition:
This clinical syndrome is extremely suspicious for physical abuse, and I do not see where there has been sufficient correlation from the parents regarding the source of this subdural hematoma. This is obviously due to acceleration/de-accel-eration injury and with the presence of retinal hemorrhages is virtually diagnostic of suspected abuse. There will not be any need for surgical evacuation of this subdural hematoma, however, we will have to follow the serial CAT scans to make sure that she does not develop enlarging chronic subdural hematomas. As you are probably aware, this is the typical natural history of these during child abuse where the patient will return with bilateral frontal subdural hemato-mas from repeated shaking and acceleration/de-acceleration injury. The appropriate authorities have been contacted.
¶ 14. On September 16, 1996, the youth court entered an order granting DHS temporary custody of S.A.M. Thereafter, S.A.M. was placed in the physical custody of the foster parents. Over the next few years, the youth court conducted numer *1270 ous hearings. These hearings all culminated in the court’s December 18, 2000, judgment. Each hearing is summarized as follows:
February 4-5, 1997 Hearing
Pursuant to the provisions of Miss. Code Ann. §§ 43-21-551 through 43-21-561, the court conducted an adjudicatory hearing to determine whether S.A.M. was an abused child. Neither the mother nor the father contested the allegations of the petition.
Following the adjudication, a disposi-tional hearing was conducted under the authority of Miss.Code Ann. §§ 43-21-601, 43-21-603 and 43-21-609. During the dispositional hearing, the DHS custody case plan was introduced. The DHS case plan explained that reunification was the permanent plan for S.A.M. and that a case plan had been entered into with the. mother, calling for her to go to counseling and parenting classes.
The report of S.A.M.’s court appointed special advocate at the time, B.J. Lambert (Lambert), was introduced. The report reflected that the mother had “complied with the original case plan, taking parenting classes and going for counseling.” “She seems very sincere about keeping [S.A.M.] safe and protecting her from any further abuse.” However, the CASA worker nevertheless recommended that S.A.M. remain in foster care.
Dr. Fromke testified that the abuse had taken place over a period of weeks, or perhaps months. His continuation record recommended that S.A.M. remain in foster care at least until she caught up and met expected developmental milestones in order to prevent delay in her development. Dr. Fromke testified that “if the child is abused any further physically, those subdurals could recur, most likely would recur ... [and] it could complicate the potential problem of hydrocephalus, which would require further shunting, further neurological demise.” Dr. Fromke stated that S.A.M.’s short term recovery was crucial to her long term recovery.
DHS witnesses testified about their goal of reunification. The mother was still in counseling at the time of the hearing. Ella Avery (Avery), the DHS area social work supervisor in Forrest County, recommended that S.A.M. be placed in the temporary care and custody of her maternal grandmother, under the supervision of DHS. She did not think S.A.M. would be at risk with the mother residing in the grandmother’s home during the temporary placement. She based this opinion upon the fact that (a) she had no information indicating the mother harmed S.A.M., (b) she had no information indicating the mother , would be likely to harm S.A.M. in the future, (c) the mother had successfully completed her parenting classes, (d) the mother •had been totally cooperative with DHS, and (e) the mother interacted well with S.A.M. and S.A.M. with the mother.
Avery also explained that temporary placement with the grandmother, with the permanent plan being reunification between the mother and S.A.M., however late, was appropriate, because the mother had not completed counseling. She also relied upon a report from Susan Turner (Turner) at'the counseling center regarding the mother’s counseling. Turner, a clinical social worker, testified that the mother had made a lot of progress in counseling and kept every appointment. Turner believed that the mother did not know about the abuse and did not perpetrate the abuse.
The foster mother also testified. She talked about the progress S.A.M. had made while in foster care. The majority of her testimony was directed at criticisms of DHS and her perception that *1271 DHS was not making sufficient efforts to provide S.A.M. with services.
A number of witnesses testified at the hearing. Jeff Kresge, Margie Cox and Tara Courtney all testified primarily about services they had provided to S.A.M. and problems they had with DHS. The youth court also called, on its own initiative, Elana Jones, Sue Perry (Perry) and Donald Taylor, all high-level DHS personnel. The focus of the testimony was primarily on what the court perceived as problems with DHS practices and procedures and the treatment of the foster parents.
After all parties rested, the youth court continued the disposition hearing so that the boyfriend could be summoned to give testimony. In the interim, the youth court ordered that DHS retain legal custody of S.A.M., with physical custody remaining -with the foster parents.
March 27, 1997 Hearing
Further testimony was taken on. March 27, 1997. The boyfriend did not appeal’ at that hearing. The youth court concluded that it was appropriate to hold the hearing in abeyance pending some matters relating to the pending criminal charges against the boyfriend. The boyfriend was never tried for or convicted of the ábuse. After two witnesses testified, the youth court ruled that the prior order remain in effect, so that S.A.M. remained in the legal custody of DHS and in the physical custody of the foster parents.
May 20, 1997 Hearing
Another hearing was conducted on May 20, 1997. Additional testimony was taken from the foster mother, the new DHS social worker assigned to the file, and a friend of the mother. Additionally, the boyfriend testified. While the boyfriend denied abusing S.A.M., he also denied having seen the mother shake or injure S.A.M. S.A.M.’s treating physician, Dr. Fromke’s continuation records were also introduced at hearing. In his opinion, S.A.M. was medically stable enough to be released from her foster parents and permanently placed in an environment that would not expose her to a risk of child abuse at the discretion of the court. Dr. Fromke recommended that S.A.M. receive follow-up neurological testing every six months and that she should also receive yearly follow-up CAT scans to be certain to check for recurrence of any complications.
July 2, 1997 Order
On July 2, 1997, the youth court entered its first dispositional order. The youth court recited that it had found, from a preponderance of the evidence, that S.A.M. was an abused child within the meaning of the Mississippi Youth Court Act. The youth court then explained that “high-level DHS-FCS administrators” had been summoned to S.A.M.’s adjudicatory and dispositional hearing so that attention could be drawn to “the impact of agency errors and misjudgments.” The youth court was very critical of DHS. The youth court was unwilling to accept the DHS recommendation stating:
We do not know who committed the physical abuse on S.A.M. The mother, nor her live-in boyfriend at the time, are excluded. Not even the grandmother has been cleared as the possible perpetrator.
The father “had nothing to do with the physical abuse,” and the youth court thought him to be a suitable parent. As a result, the youth court ordered that physical custody of S.A.M. be transferred to her biological father in New York. The mother was granted visitation *1272 rights according to the policies of the New York agency. In less than thirty days, however, the biological father placed S.A.M. in the care of the New York Department of Social Services on the grounds that he could not care for her. S.A.M. was returned to Mississippi, and the youth court ordered that the legal custody of the child remain with DHS and physical custody with the Mississippi foster parents.
September 8, 1997 Hearing
On September 8, 1997, the youth court conducted a review hearing. The guardian for S.A.M. argued that since the identity of the perpetrator was still unknown, S.A.M. should remain in the custody of the foster parents. The youth court agreed. No actual order following this hearing appears in the record. On December 18, 1997, the father filed an affidavit relinquishing his parental rights.
March 31, 1998 Hearing
The youth court conducted another review hearing on March 31, 1998. DHS introduced a report reflecting its positive evaluation of the visits taking place between the mother and S.A.M. DHS stated that its permanent plan was to return S.A.M. to the mother, and DHS recommended increasing visitation, leading up to overnight stays. The CASA worker, Lambert, recommended freeing S.A.M. for adoption. At the end of that hearing, the youth court left the record open and took the matter under advisement. No order following this hearing appears in the record.
July 10, 1998 Hearing
The next review hearing took place on July 10, 1998. The court stated that it was still considering a range of placements, including reunification of S.A.M. and the mother.
The youth court noted “from the point of the original dispositional order until now, this court has continuously said that — and there has been no evidence to the contrary — that the perpetrator is unknown in this case.” The youth court also noted that the legislature had recently amended the statutes to allow a new form of disposition known as “durable legal custody.”
The youth court requested that DHS review the permanency plan. He urged the parties to “look at the durable legal custody aspects of this case.”
Following the July 10, 1998, hearing, the youth court entered an order. The order stated that S.A.M. would remain in the legal custody of DHS and physical custody of the foster parents. The matter was reset for another review hearing on October 6,1998.
October 6, 1998 Hearing
The next review hearing was conducted on October 6, 1998. The transcripts reflects that little action of consequence was taken. No formal order was entered following this hearing.
December 15, 1998 Hearing
The next review hearing was conducted on December 15, 1998. The hearing was continued to give the mother’s new attorney an opportunity to review the record. The mother had filed a motion to have S.A.M. returned to her, or in the alternative, to expand visitation, based in part upon the fact that she had recently married and was able to provide a better home for S.A.M.
At that hearing, the DHS December 8, 1998, court report and permanent plan were admitted into evidence. The DHS report stated that DHS had considered all permanent options for S.A.M., including (1) return to parent, *1273 (2) relative placement, (3) termination of parental rights and (4) durable legal custody.
Although DHS recognized the perpetrator had not been identified by the court. DHS argued that the mother had worked with DHS in achieving goals. Those included successfully completing parenting classes, attending individual counseling, undergoing a favorable psychological evaluation, maintaining gainful employment, and attending weekly supervised visitation with S.A.M. DHS did not believe a termination of parental rights was appropriate. DHS policy provides that no case should be considered for a termination of parental rights until diligent efforts to return the child have failed. More importantly, DHS found no grounds for termination of parental rights.
With respect to durable legal custody, DHS recognized that the foster parents had expressed an interest in that type of placement. DHS did not recommend it, however, because it thought the mother was continuing to meet the goals necessary for reunification.
January 19, 1999 Hearing
The next review hearing took place on January 19, 1999. The youth court explained at the beginning of the hearing that the CASA worker, Lambert, had been replaced with a new CASA worker. Lambert has submitted many reports and recommendations to the youth court, and while she offered varying suggestions as to S.A.M.’s placement, she always opposed reunification. She was replaced due to the appearance of a possible conflict.
Judge MePhail then recited the various dispositional alternatives available. One of these included “reunification with the biological parent, and in this case it would be with the mother.” A home visit of the mother’s new home reflected that it was suitable and appropriate for housing. At the close of the January 19, 1999, hearing, the youth court took the matter under advisement. No formal order was entered at the conclusion of the hearing. •
January 13, 2000 Recusal
Approximately one year later, on January 13, 2000, Judge MePhail entered an order of recusal without having made a further ruling on S.A.M.’s disposition. Judge MePhail stated that he felt disqualified to hear this matter “by reason that in the beginning of this case much of the court’s concerns were directed toward the problems of the investigation, management and coordination of the DHS-FCS service.” Judge MePhail also recognized the need for “proper detachment” so as to “eliminate any perceived bias.” Judge Ward was then appointed special judge in these proceedings by this Court.
March 17, 2000 Hearing
On March 17, 2000, Judge Ward conducted a hearing. Some additional exhibits were submitted, but no testimony was taken.' Judge Ward stated that the transcript would be typed. The guardian was also to submit a report and recommendation.
In the guardian’s report, he determined that the evidence did not reveal the identity of the perpetrator. He further concluded that éven if the mother did not abuse S.A.M., she must have been aware of it. He recommended durable legal custody be granted to the foster parents.
¶ 15. On December 18, 2000, Judge Ward granted- durable legal custody of S.A.M. to the foster parents. This disposition was made under Miss.Code Ann. §§ 43-21-609 & —613. Further review *1274 and oversight by DHS was terminated. The youth court allowed the mother visitation with S.A.M. twice a month for no longer than one hour at a time, supervised by CASA.
¶ 16. On December 20, 2000, the mother filed a motion to stay, motion to reconsider and motion for new trial. The youth court denied the motions and filed an order on January 5, 2001, to that effect. The mother now appeals to this Court.

LEGAL ANALYSIS

¶ 17. When a trial court sits without a jury, an appeal of that final judgment may challenge the trial court’s findings of facts, its conclusions of law, or both. It is well-established in Mississippi practice that' findings of fact will not be overturned where they are supported by substantial evidence in the record, unless manifestly wrong. See Tricon Metals & Servs., Inc. v. Topp, 516 So.2d 236, 238 (Miss.1987); In re S.M., 739 So.2d 473, 474 (Miss.Ct.App.1999). With respect to proceedings in youth court, this Court’s standard of review is limited. In re S.B., 566 So.2d 1276, 1278 (Miss.1990). We do not proceed de novo. Id. The standard of review applied is if reasonable men could not have found as the youth court did by a preponderance of the evidence, then the appellate court must reverse. Id. See also In re T.L.C., 566 So.2d 691, 701 (Miss.1990).
I. Reunification
¶ 18. The primary issue raised by the mother for consideration by this Court is whether the youth court erred in granting durable legal custody to the foster parents rather than reuniting the mother with her child. The mother’s assignment of error basically focuses on her allegation that the youth court did not attempt to reunite the mother and child before granting durable legal custody.
¶ 19. Miss.Code Ann. § 43-21-603(7)(c)(2000) provides:[3]
(7) In the event that the youth court orders that the custody or supervision of a child who has been adjudicated abused or neglected be placed with the Department of Human Services or any other person or public or private agency, other than the child’s parent, guardian or custodian, the youth court shall find and the disposition order shall recite that:
(c) Reasonable efforts to maintain the child within his home shall not be required if the court determines that:
(i) The parent has subjected the child to aggravated circumstances including, but not limited to, abandonment, torture, chronic abuse and sexual abuse; or
(ii) The parent has been convicted or murder of another child of such parent, voluntary manslaughter of another child of such parent, aided or abetted, attempted, conspired or solicited to commit such murder or voluntary manslaughter, or a felony assault that results in the serious bodily injury to the surviving child or another child of such parent; or
(iii) The parental rights of the parent to a sibling have been terminated involuntarily; and
(iv) That the effect of the continuation of the child’s residence within his own home would be contrary to the welfare of the child and that placement of the child in foster care is in the best interest of the child.
The paramount concern in determining the proper disposition is the best interest of the child, not reunification of the family. Petition of Beggiani, 519 So.2d 1208, 1213 *1275 (Miss.1988). Furthermore, in G.Q.A. v. Harrison Cty. Dep’t of Human Servs., 771 So.2d 331, 336 (Miss.2000), this Court emphasized that the polestar consideration in determining disposition is the best interest of the child.
¶ 20. In the instant case, the mother admitted the allegations set forth in the youth court petition. However, on appeal, the mother claims that she did not abuse S.A.M. In support of her contention that the youth court was misguided by its concern that the abuser or abusers had never been identified, the mother states that she “knows it must have been her prior live-in boyfriend ... [because] [she] knows she did not abuse her daughter” and she “knows the kind of man [he] is.”[4] The boyfriend denied that he had any involvement in the abuse, and he was never tried for or convicted of the abuse.
¶ 21. The mother claims that she never noticed that her sixteen-month-old child suffered from rib fractures to the 7th, 8th, and 9th posterior left ribs in various stages of healing; a fracture to the 6th lateral rib; a fracture to the right tibia; a right frontal acute subdural hematoma; a retinal hema-toma; and fluid build up on the brain, until the child's seizure forced the need for medical attention. The mother claims that all the injuries occurred on the day she carried S.A.M. to the hospital, despite medical evidence to the contrary.[5] The mother claims that on the day in question she heard the child cry while she was in her laundry room, but she did not go and check on the child. The mother claims the boyfriend must have been the one' who caused the injuries to S.A.M. because he was in the other room with the child. The boyfriend, however, testified that he carried the baby to the mother when the child continued to cry.
¶22. The mother attempts to deflect attention by arguing that, absent evidence of her admission or an eyewitness that she struck or shook S.A.M., she is not responsible for the life threatening abuse sustained by the child over a period of weeks or months. Dr. Fromke testified that due to the injuries sustained, the child could not be subjected to any further abuse which could result in “neurological demise.” The boyfriend made a similar denial of abusé. Neither the boyfriend nor the mother were tried or convicted on any criminal charges related to the child. However, it is blatantly obvious from the medical evidence that chronic abuse did occur, and this abuse occurred over a period of time without any intervention.
¶ 23. Furthermore, Perry, executive director of the family and children’s services division of DHS, admitted when subpoenaed by the youth court to account for what the youth court perceived as DHS’s mishandling of the case, that a child’s welfare was more important than family reunification. In Perry’s testimony before the youth court on March 31, 1998, she stated that S.A.M. was a victim of chronic abuse, and she further stated that reasonable efforts to reunify an abused child with the parent could be suspended if they are determined to be contrary to the best interest of the child’s safety and permanence.
¶ 24. At the hearing on July 10, 1998, the youth court held that:
Is it not the responsibility of a parent, especially of a mother, to protect her *1276 child from harm? I mean, I think that is a fundamental principle. And from the position of this court, when a mother fails to protect her child from a live-in-boyfriend or her mother or any person, or herself committed the abuse, I think that shows a great deal about the attitude and behavior with regard to what is in a child’s best interest.
¶ 25. In light of the statutory requirements that the court must consider the evidence before the court, the youth court determined that reunification of the mother and child was not in the best interest of S.A.M. The mother never appealed the July 10, 1998, decision excluding her as a placement alternative for S.A.M. On December 14, 2000, the youth court awarded durable legal custody to the foster parents.
¶ 26. In 1998, the Mississippi Legislature, recognizing the need for a more permanent form of custody for neglected and abused children, amended Miss.Code Ann. § 43 — 21—609(b) (2000), to provide that in neglect and abuse cases the disposition order may include the following alternative:
Place the child in the custody of his parents, a relative or other person subject to any conditions and limitations as the court may prescribe. ’ If the court finds that temporary relative placement, adoption or foster care placement is inappropriate, unavailable or otherwise not in the best interest of the child, durable legal custody may be granted by the court to any person subject to any limitations and conditions the court may prescribe; such durable legal custody will not take effect unless the child or children have been in the physical custody of the proposed durable custodians for at least one (1) year under the supervision of the Department of Human Services. The requirements of Section 43-21-613 as to disposition review hearings does not apply to those matters in which the court has granted durable legal custody. In such cases, the Department of Human Services shall be released from any oversight or monitoring responsibilities;
Miss.Code Ann. § 43 — 21—609(b). Under durable legal custody, unlike termination of parental rights or adoption, the natural parents retain “residual rights and responsibilities” as to the child. Miss.Code Ann. § 43-21-105(y) (2000).
¶ 27. Furthermore, this Court in G.Q.A., a termination of a parental rights case, 771 So.2d at 335, stated that:
Congress recently enacted the Adoption and Safe Families Act of 1997 (ASFA), Pub.L. No. 105-89, 111 Stat. 2115 (1997), in order to increase the safety of children. In pursuing that goal, ASFA provides that “reasonable efforts” to reunite children with their parents “shall not be required ... if a court of competent jurisdiction has determined that (i) the parent has subjected the child to aggravated circumstances as defined in State law, which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse.” 42 U.S.C.A. § 671(a)(15)(D)(i) (Supp.2000). Essentially, ASFA clarifies that a child need not be forced to remain in or be returned to an unsafe home and allows the States' to place the safety and welfare of the child before the interest of abusive parents.
¶ 28. In the case sub judice, the youth court chose durable legal custody as the proper alternative for disposition and entered its decision in its opinion on December 18, 2000. In Judge Ward’s opinion, he stated that “the [cjourt has read the transcripts of the prior proceedings and reviewed the documentary evidence. In addition, the [gjuardian’s [rjeport and the [rjesponses ... have been read.” Judge Ward considered the evidence before the *1277 youth court in order to determine what disposition was in the best interest of the child. The mother was granted restricted visitation with the child subject to supervision by CASA. The youth court noted in its opinion that a decision to award durable legal custody is not a permanent decision, but it remains subject to modification.
¶ 29. Clearly, S.A.M.’s situation of chronic abuse and long-term physical placement with the same foster family since 1996, except for the brief, unsuccessful placement with the natural father, satisfies the statutory basis for durable legal custody.
¶ 30. We determine that the youth court did not err in ordering that it was in the best interest of the child to grant durable legal custody to the foster parents subject to continued supervised visitation with the mother. However, we determine that the better course of action would have been for Judge Ward to have conducted a hearing with live witnesses to get updated information on the case following his appointment to hear this matter rather than basing his decision solely upon transcripts, documentary evidence, guardian’s report and response filed thereto. We find that this assignment of error is without merit.
II. Constitutionality
¶ 31. The mother claims that the 1998 amendments by the Mississippi Legislature creating durable legal custody as a dispositional alternative are unconstitutional. She claims that the current statutory framework is unconstitutional on two grounds:
First, they violate the due process clause by allowing the youth court to enter an order that has the same effect on a parent as a termination of parental rights, but [it] does not give that parent the constitutional protections required in TPR proceedings.
Second, they violate the equal protection clause by denying certain parents, such as [the mother], rights to ongoing reviews and to DHS oversight and monitoring simply because the form of disposition chosen is durable legal custody, whereas all other parents whose children have been subject to a different dispositional order continue to retain those rights.
She further argues that:
[C]hoices about marriages, family life and the upbringing of children are among the associational rights that are of “basic importance in our society” and are rights protected by Fourteenth Amendment against a State’s unwarranted usurpation, disregard or disrespect. M.L.B. v. S.L.J., 519 U.S. 102, 116, 117 S.Ct. 555, 564, 136 L.Ed.2d 473, 487 (1996). “[T]he right of a parent not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect is so fundamental to our society and so basic to our constitutional order” that it ranks among the rights referred to in the Ninth Amendment of the United States Constitution as having been retained by the people. In re J.P., 648 P.2d 1364, 1375 (Utah 1982).
¶ 32. However, the mother never raised her constitutional objections to durable legal custody at the youth court level. In Jones v. State, 606 So.2d 1051, 1058 (Miss.1992), this Court held that “a trial judge will not be found in error on a matter not presented to him for decision.” There is a general requirement that objections be raised at the trial level. In re V.R., 725 So.2d 241, 245 (Miss.1998). See Riley v. Doerner, 677 So.2d 740, 743 n. 3 (Miss.1996); Smith v. State, 572 So.2d 847, 848 (Miss.1990); Burney v. State, 515 So.2d 1154, 1156-57 (Miss.1987).
¶ 33. This Court has held that the mere fact that an issue is constitutional in nature does not circumvent the requirement *1278 that it be raised as an objection at the-trial court level. In re V.R., 725 So.2d at 245, See Colburn v. State, 431 So.2d 1111, 1114 (Miss.1983). This Court recently followed In re V.R., by stating:
The parents failed to raise the constitutionality of the statute at trial. This Court has held that although an issue is constitutional in nature, it is not absolved from the general rule that objections must be raised at the trial level. In re V.R., 725 So.2d 241, 245 (Miss.1998). See also Smith v. Fluor Corp., 514 So.2d 1227, 1232 (Miss.1987) (holding that the constitutionality of a statute will not be considered unless the point is specifically pleaded); Colburn v. State, 431 So.2d 1111, 1114 (Miss.1983) (determining that failure of defendant to raise a constitutionality question about an aggravated assault statute in a proper motion before the trial court is a constitutional waiver of any error and precluded defendant from seeking reversal on this ground on appeal). The parents had ample opportunity to argue this issue during any one of their numerous hearing, but failed to do so barring the issue on appeal.
In re D.O., 798 So.2d 417, 423 (Miss.2001).
¶ 34. Furthermore, this Court stated that the Attorney General must be noticed of the constitutional challenge to a statute and an opportunity to respond. Id. The record does not reflect that such notice was afforded in the case at hand. While the Attorney General’s office does appear in this appeal on behalf of DHS, the Attorney General’s office does not address the constitutionality of the durable legal custody statutes. This Court has held:
Serving as a second procedural bar, the parents failed to send notice of their challenge to the Attorney General, violating Rule 24(d) of the Mississippi Rules of- Civil Procedure which requires that proper notice be given to the Attorney General when the constitutionality of a statute is challenged “to afford him an opportunity to intervene and argue the question of constitutionality.” Pickens v. Donaldson, 748 So.2d 684, 691 (Miss.1999) (citing Miss. R. Civ. P. 24(d)). Rule 44(a) of the Mississippi Rules of Appellate Procedure similarly requires service of any appellate brief challenging the validity of a statute “on the Attorney General, the city attorney, or other chief legal officer of the governmental body involved.” Pickens, 748 So.2d at 691 (citing M.R.A.P. 44(a)). “Except by special order of the court to which the case is assigned, in the absence of such notice neither the Supreme Court nor the Court of Appeals will decide, the question until the notice and right to respond contemplated by this rule has been given to the appropriate governmental body.” Id. at 691. The parents’ failure to raise the issue of the constitutionality of a statute at trial or to notify the Attorney General’s Office of their challenge of the statute results in the procedural bar on this issue.
In re D.O., 798 So.2d at 423.
¶ 35. Therefore, since the mother did not raise her constitutional challenges at the youth court level, we refuse to address this issue on appeal.
¶ 36. The mother further contends that durable legal custody and termination of parental rights are in effect the same form or disposition without requiring the same safeguards as afforded in a proceeding for termination which requires a clear-and-convincing standard of evidence. This allegation is without merit. There exists a clear distinction between durable legal custody and a proceeding for termination. Durable legal custody was enacted by the Legislature to serve as an alternative form of disposition. Durable legal custody does not terminate parental rights, thereby per *1279 manently removing the parents from residual contact with the child.
¶ 37. Miss.Code Ann. § 93-15-103(h) (2000) provides durable legal custody as an alternative to termination of parental rights. Miss.Code Ann. § 93 — 15—103(h) states:
Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the Department of Human Services should be considered as alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights.
¶ 38. Miss.Code Ann. § 43-21-105(y) further provides that:
Durable legal custody means the legal status created by a court order which gives the durable legal custodian the responsibilities of physical possession of the child and the duty to provide him with care, nurture, welfare, food, shelter, education and reasonable medical care. All these duties as enumerated are subject to the residual rights and responsibilities of the natural(s) or guardian(s) of the child or children.
If 39. The fact that under durable legal custody the parent retains some form of residual rights and responsibilities is a vital and obvious distinction to termination of parental rights. Another distinction is that a decision to grant durable legal custody is not permanent and is, therefore, subject to further review and modification by the courts. In the case at hand, the youth court determined that it was in best interest of S.A.M. that durable legal custody be granted to the foster parents subject to the mother’s restricted, supervised visitation. In its opinion, the youth court specifically stated that “durable legal custody [is] similar to a grant of guardianship in chancery [court].” The youth court further stated, “like a guardianship, or for that matter any grant of custody by chancery [court], durable legal custody is not permanent and is subject to modification.”
¶ 40. While Miss.Code Ann. § 93-15-103(h) clearly states that “legal custody and guardianships by persons other than the parent as well as other permanent alternatives which end the supervision by the Department of Human Services should be considered as alternatives to the termination of parental rights,” durable legal custody as defined by the Legislature under Miss.Code Ann. § 43-21-105(y) does not contain any language which precludes the youth court’s retention of jurisdiction in the matter, further involvement by DHS in monitoring the placement of the child or further court ordered dispositional reviews of the placement. Miss.Code Ann. § 43-21-613(3)(a) provides:
Unless the youth court’s jurisdiction has been terminated, all disposition orders for supervision, probation or placement of a child with an individual or an agency shall be reviewed by the youth court judge or referee at least annually to determine if continued placement, probation or supervision is in the best interest of the child or the public.
However, Miss.Code Ann. § 43-21-609(b) specifically removes the requirements of annual dispositional reviews under Miss. Code Ann. § 43-21-609(3)(a) when the youth court has granted durable legal custody. We, therefore, determine that the intent of durable legal custody is merely to avoid the required annual dispositional reviews by the youth court and constant oversight and monitoring by DHS, not a complete preclusion of the court’s jurisdiction, DHS’s further involvement or court ordered review hearings as needed. We determine that the youth court erred in holding that:
*1280 The grant of durable legal custody contemplates a relieving of DHS from its responsibilities in this matter ... Because FCDHS has committed the violations hereinabove enumerated and because the [c]ourt finds the law to be that FCDHS should be finally relieved in a case in which durable legal custody is granted ...
¶ 41. Furthermore, we find the mother’s argument that a grant of durable legal custody is in effect the same form of disposition as termination of parental rights is not accurate and is wholly without merit.

CONCLUSION

¶ 42. For these reasons, the youth court’s judgment is affirmed as to granting durable legal custody to the foster parents and reversed and remanded back to the youth court in order to correct the remainder of its judgment consistent with the opinion of this Court. The youth court erred in “finally” relieving DHS from having any further involvement in the placement of the child. While annual court-ordered dispositional reviews by the youth court and constant DHS involvement are not a requirement when placement of a child is made under durable legal custody, DHS still retains its ability to monitor the placement of the child and the youth court maintains jurisdiction over the matter and the ability to schedule and conduct disposi-tional reviews of the placement as needed.
¶ 43. AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ, CARLSON AND GRAVES, JJ., CONCUR. PITTMAN, C.J., CONCURS IN RESULT ONLY.

. On January 3, 2001, McMahan withdrew as guardian, and he was replaced by Clifton S. Gaddis as the new guardian for S.A.M. However, McMahan, by order dated January 18, 2001, remained guardian for purposes of appeal to this Court.

. The mother subsequently gave birth to the boyfriend's son. The mother contends that she has not had any contact with the boyfriend since S.A.M. was hospitalized for the abuse she sustained.

. Miss.Code Ann. § 43-21-603(7) was amended by the Legislature in 1998.

. The boyfriend testified at proceedings in youth court that he was dishonorably discharged from the military prior to his relationship with the mother, and he once kicked a hole in the door because the mother would not let him in the room. However, despite the mother’s claim that she "knew what kind of man” he was, the mother and the boyfriend lived together with S.A.M. in the home.

. Dr. Fromke testified the injuries occurred over a period of several weeks or months.