# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00476-COA

IN THE INTEREST OF A.B., A MINOR: LINDA BRISCO AND JOSEPH BRISCO     APPELLANTS

**v.**

LATOYA BRISCO     APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/13/2024 |
| TRIAL JUDGE: | HON. MARCIE TANNER SOUTHERLAND |
| COURT FROM WHICH APPEALED: | WARREN COUNTY YOUTH COURT |
| ATTORNEY FOR APPELLANTS: | MICHAEL EARL KEYTON |
| ATTORNEY FOR APPELLEE: | LATOYA BRISCO (PRO SE) |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 09/02/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1. Latoya Brisco was sentenced to serve time in the custody of the Mississippi Department of Corrections (MDOC) in 2017. When she began her incarceration, her parents, Joseph and Linda Brisco, were given temporary custody of Latoya's son, A.B., by the Warren County Youth Court. In 2021, Brisco was released from prison and moved in with her parents and A.B. in Vicksburg. But in May 2023, the relationship between Latoya and her parents deteriorated beyond repair, and Latoya moved out. She filed a motion in youth court to regain custody of A.B. After several hearings, the youth court found that there had been a substantial change in circumstances since the Briscos were given custody of A.B. and that it would be in A.B.'s best interest to return to his mother's custody.

¶2.     The Briscos appealed the youth court's decision, arguing that Latoya had not proved a material change in circumstances, that the youth court should have required CPS to continue to monitor Latoya, and that the youth court should have granted a continuance so they could subpoena a witness. We find no error and affirm.

**FACTS AND PROCEDURAL HISTORY**

¶3.     In 2017, Latoya was found guilty of manslaughter in Warren County Circuit Court and was sentenced to serve time in MDOC custody.[1] In June 2017, a youth court judge granted the Briscos temporary custody of A.B. after finding that it was in his best interest to be "placed in the care, custody, and control" of his maternal grandparents. The Briscos took A.B. to visit Latoya each month, and the mother and son were able to continue their relationship this way.

¶4.     Latoya was released from incarceration in 2021 and moved in with her parents and A.B. For roughly a year, she was on parole and wore an ankle-monitoring device. After she was discharged from parole, she was placed on supervised probation and had to report to a probation officer.[2] By July 2023, Latoya was completely free from MDOC's custody and oversight, and she petitioned the youth court to have custody returned to her.

¶5.     The youth court judge appointed a guardian ad litem (GAL) to investigate A.B.'s well-

---

[1] *Brisco v. State*, 295 So. 3d 498 (Miss. Ct. App. 2019).

[2] We recognize that "supervised probation and post-release supervision are totally different statutory creatures" and that "supervised probation" may not be the correct name for the supervision Latoya experienced following her release. *See Miller v. State*, 875 So. 2d 194, 199 (¶10) (Miss. 2004); *see also* Miss. Code Ann. §§ 47-7-33, 47-7-34 (Rev. 2023). However, we have used the terminology used by the parties at the hearing.

being and make a recommendation to the court on the custody determination. The youth court held several hearings over the next few months. Following the first hearing, the court ordered that A.B. be granted unsupervised alternating weekend visitation with A.B. and Saturday visitation on the other weekends. The court later increased Latoya's visitation to every weekend, and the court ultimately found that Latoya should regain full custody of A.B.

¶6.     A summary of the testimony from the hearings follows.

*Shirlene Hill, CPS Social Worker*

¶7.     Hill testified that she saw no reason why Latoya and A.B. should not be reunited. She visited Latoya's home and found it to be safe and secure. She confirmed that Latoya was working and receiving disability payments and that her income would allow her to provide adequately for A.B. The Briscos questioned Hill extensively about Latoya's medical history and any possible red flags. Hill testified, however, that she found nothing in Latoya's medical history to make her change her opinion that Latoya should regain custody of A.B. She testified that she had reviewed all of Latoya's medical history, and despite Latoya's issues with depression and bipolar disorder, among other things, Latoya appeared to be "meeting her mental health needs."

¶8.     Hill conducted background checks on all of Latoya's roommates and saw no causes for concern. Hill spoke with A.B., and he had not expressed any issue or concern with her. Hill concluded that all his basic needs were met when he was with his mother.

¶9.     Hill also noted that after the court ordered the family to participate in family counseling, Joseph called her and told her that he and Linda would not participate. Hill

described the Briscos as fairly uncooperative during her entire investigation.

*Latoya Brisco, A.B.'s mother*

¶10.   Latoya testified that it was "horrible" living with her mother again and that her father had a problem with her because she was a lesbian. But the problems between Latoya and her parents extended beyond her sexuality. Latoya described arguments over helping A.B. with homework, the volume of the television, vacations, and even the way Latoya dressed. All of these things came to a head in 2023, when Latoya moved out and tried to take A.B. She testified that Linda called the police to stop her from taking A.B., so Latoya filed a motion in youth court to transfer custody back to her.

¶11.   Latoya testified that before that final fight, she had been able to come and go freely with A.B. Despite the tense relationship between Latoya and her parents, she testified that she had been able to care for A.B. like a mother while they were both living at the Briscos' home. It was not until she moved out and tried to take A.B. that her parents used the custody order against her.

¶12.   After leaving her parents' home, Latoya lived in a four-bedroom home with a high school friend of hers, and A.B. had his own room at the house. Latoya testified that she was working two different security jobs and receiving disability payments for her anxiety and depression issues. Her primary working hours were overnight from 10:45 p.m. to 6:45 a.m., and she sometimes worked on Sundays and Wednesdays at a local church.  Latoya testified that one of her roommates and one of her cousins had both agreed to watch A.B. while she worked overnight and to help Latoya with getting him to school if required.

¶13.    Sometimes Latoya's girlfriend, Felicia, would help her care for A.B. Felicia and Latoya had been dating for over a year, and Felicia had two children whom A.B. enjoyed spending time with. Latoya testified that her parents—primarily her father—did not approve of her relationship with Felicia. Despite this, the Briscos allowed her to take A.B. on overnight, out-of-state vacations with Felicia. She testified that whenever she left the state, she had permission to do so from her parole officer.

¶14.    Latoya admitted that she occasionally got angry with A.B. and had fussed at him for bad grades. She testified that her mom, Linda, had done a "great" job with A.B. while she had been in prison. She knew that A.B. loved her parents and that he was "distraught" over the custody battle. She said if she was given custody again, she would still allow them to be in his life.

*Joseph Brisco Jr., Latoya's Brother*

¶15.    Joseph Jr. testified that he and Latoya had frequent communication since she had been released from prison, and he did not believe she had been rehabilitated. Much of Joseph Jr.'s testimony was based on hearsay because he was not present for many of the alleged events. He testified that the name she used on Facebook was a reference to drugs. He claimed that A.B. had told someone he did not want to stay in his room at night, but it was unclear whether this referred to being with Latoya or not. He claimed that Latoya had "cursed [A.B.] out" but later clarified that she had told A.B. "to get out in front of the damn TV." The crux of Joseph Jr.'s testimony was that Latoya's mental health was unstable. He described her as having a Jekyll-and-Hyde personality and that he never knew which Latoya he would

5

encounter.

*Crystal Clements, Latoya's Sister*

¶16.    Crystal testified that she and Latoya talked weekly and that she had seen Latoya's anger issues increase since she got out of prison. Like Joseph Jr., she claimed that Latoya's moods were unpredictable. She testified that Latoya was not patient with A.B., particularly about homework, and she claimed that Latoya had called A.B. stupid. She felt that A.B. should stay with the Briscos because they had him on a better routine than Latoya. Crystal claimed that A.B. seemed out of sorts when he came back from visitation with Latoya, and she suspected that a lack of routine was to blame.

*Linda Brisco, Latoya's Mother*

¶17.    Linda testified that she wanted A.B. to be in a safe and stable environment and doubted that Latoya could provide that. She testified that Latoya had no patience with A.B. while he did his homework. She claimed that A.B. was afraid of his mother and her temper and that Latoya had threatened to "pop" A.B. Linda claimed that she had put a lock on her bedroom door so she and A.B. could hide from Latoya.

¶18.    Linda described an argument when Latoya came to the school where Linda worked to confront Linda about a tax deduction involving A.B. Linda said that after the argument, Latoya wanted to pick up A.B. from school and that she could not because of the custody order. The argument became so heated between the two women that campus police intervened.

*Joseph Brisco Sr., Latoya's Father*

6

¶19. Joseph testified that Latoya "had an attitude" before, during, and after her incarceration. He described her as a bully who wanted to "bully people around." He said that the day they picked her up from prison, they got into an argument because he did not feel that she was being "humble" enough and that he was "not going to let her rule [him] when she [was] under [his] leadership."

¶20. Joseph testified that he did not really speak to Latoya anymore because "of what is going on with CPS and her." He claimed that Latoya had insinuated that she would kill him, like when she committed manslaughter. Joseph also claimed that Latoya did not have permission to leave the state when she took A.B. on trips, but he admitted that he had not tried to stop her or report her.

*Eric Proctor, Latoya's Probation Officer*

¶21. Proctor testified that he had never had a problem with Latoya while she was on supervised probation. He considered her to be rehabilitated under MDOC standards. Latoya reported to him every time she was supposed to and never failed a drug test.

¶22. Proctor explained that before she had been on supervised probation under his supervision, she was on parole and wearing an ankle monitor with GPS. If she had left the state while wearing the monitor, it would have been a violation of her probation. And if she had violated her probation terms, he did not think she would have been allowed to move to supervised probation.

¶23. Proctor testified that he had never given her permission to leave the state and had no knowledge that she had done so. If she had left without permission, she would have been in

violation of her probation.

*A.B., Latoya's Son*

¶24.    A.B. told the court in chambers, while in the presence of counsel, that he wanted to live with his mother. The youth court remarked several times how A.B. was a very bright and sweet young man who loved his mother and his grandparents very much. When A.B. testified after being called by the Briscos, he testified that he did not like staying with his mother in Clinton "too much." He said he would rather be in Vicksburg, where his grandparents lived, and visit his mother "at least on the weekends." He denied being afraid of Latoya.

¶25.    During A.B.'s testimony, Joseph Sr. excused himself from the room. The youth court judge remarked on this and apparently found it to be "very telling" that he would "put a ten-year-old child on the witness stand" and not "even sit and listen to it."

¶26.    Latoya testified after A.B.'s testimony that she believed her parents had "coached" A.B. into testifying that he did not want to live with her.

*Guardian ad Litem*

¶27.    The GAL testified that it was in A.B.'s best interest to be with Latoya. She had seen nothing that was a danger or threat to his well-being and noted that there had been no negative report about Latoya to CPS. Even after hearing all of the testimony, her opinion was the same. She disagreed with Latoya's family's concern over Latoya's mental health. She believed that Latoya had "very good" insight into her mental health and was taking it seriously.

¶28.    The GAL testified that A.B. seemed to be stuck in the middle of his mother and

8

grandparents; he loved everyone and just wanted them to get along. She said that A.B. had sometimes told her he wanted to be with his mother, and other times he said he wanted to be with his grandmother. However, keeping the fact that Latoya was A.B.'s natural mother in mind, she saw no reason that Latoya should not have custody of her son.

* * * * *

¶29. The youth court returned custody of A.B. to Latoya. The court's order noted that the Briscos were "filled with animosity toward [ Latoya] and would do whatever they could to keep [her] from regaining custody of [A.B.]." The court found a "complete breakdown" of the family relationship and that it was detrimental to A.B.'s well-being. The court questioned Joseph Jr.'s credibility, as he did not live in Warren County and did not see Latoya often. The court also noted that Joseph Jr. had "much antipathy" for Latoya. Ultimately, the court concluded that his testimony was not credible.

¶30. The court further concluded that Latoya's right as A.B.'s natural parent trumped that of the Briscos. She specifically found a "substantial change" in circumstances: Latoya was no longer incarcerated, was employed and had stable housing, and there was no evidence of harm to A.B. while Latoya had visitation with him. Given this, the court found it was in A.B.'s best interest to return custody to Latoya.

**ANALYSIS**

¶31. On appeal, the Briscos argue that the youth court erred by finding a material change in circumstances and finding that it was in A.B.'s best interest to be returned to Latoya's custody; that the court erred "by closing the file and relieving CPS from any obligation to

9

monitor the relationship between" A.B. and Latoya; and that the court erred by not granting their motion to continue in order to subpoena a witness for purposes of impeachment.

¶32. Our review of youth court cases is limited. *Kevin v. Miss. Dep't of Child Prot. Servs.*, 341 So. 3d 1014, 1018 (¶9) (Miss. Ct. App. 2022). The youth court judge, sitting without a jury, is the trier of fact. *Id.* Findings of fact by a youth court judge "will not be overturned where they are supported by substantial evidence in the record, unless manifestly wrong." *In re S.A.M.*, 826 So. 2d 1266, 1274 (¶17) (Miss. 2002). Decisions regarding witness credibility are left to the youth court judge as the fact finder. *See In re D.O.*, 798 So. 2d 417, 422 (¶17) (Miss. 2001) ("The trier of fact chose to believe Dr. Townsend over Dr. Islam, and [the child] over the parents. Such is the charge of the fact finder.").

## I. Material Change in Circumstances

¶33. The Briscos argue that the youth court erred by finding that Latoya had proved a material change in circumstances to allow modification of custody. To address this contention, it is necessary to examine the statutory framework leading up to the youth court's decision.

¶34. Youth courts have the "exclusive original jurisdiction in all proceedings concerning a delinquent child, a child in need of supervision, a neglected child, an abused child or a dependent child." Miss. Code Ann. § 43-21-151(1) (Supp. 2024). A neglected child is one "[w]ho is otherwise without proper care, custody, supervision or support." Miss. Code Ann. 43-21-105(l)(ii) (Supp. 2025). In a case of neglect, the youth court may "place the child in the custody of . . . a relative" and may grant the relative "durable legal custody" of the child.

*See* Miss. Code Ann. § 43-21-609(b) (Rev. 2023); Miss. Code Ann. § 43-21-105(y).

¶35.    Durable legal custody "means the legal status created by a court order which gives the durable legal custodian the responsibilities of physical possession of the child and the duty to provide him with care, nurture, welfare, food, shelter, education and reasonable medical care. All these duties as enumerated are subject to the residual rights and responsibilities of the natural parent(s) or guardian(s) of the child or children." Miss. Code Ann. § 43-21-105(y). "Under durable legal custody, unlike termination of parental rights or adoption, the natural parents retain residual rights and responsibilities as to the child." *In re S.A.M.* 826 So. 2d at 1276 (¶26). Durable legal custody "is not permanent and is, therefore, subject to further review and modification by the courts." *Id.* at 1279 (¶39).

¶36.    Mississippi Code Annotated section 43-21-613(2) (Rev. 2015 & Supp. 2025) grants the youth court discretion to "conduct an informal hearing to review [a] disposition order" if a child's parent or guardian moves for a review. If, after review, "the youth court finds a material change of circumstances relating to the disposition of the child, the youth court may modify the disposition order to any appropriate disposition of equal or greater precedence which the youth court could have originally ordered." *Id*.

¶37.    The 2017 order granting custody to the Briscos makes no finding that A.B. is a neglected child, but looking at applicable statutes, it appears that the Briscos were granted durable legal custody of A.B. upon the youth court's order. Once Latoya filed to have custody returned to her, the youth court's orders all identify A.B. as a neglected child under section 43-21-105(l)(ii). During the hearings, the youth court repeatedly stated that A.B.'s

11

status as a neglected child was a settled matter. Since A.B. was a neglected child under the statute, the youth court order in 2017 granted the Briscos durable legal custody of A.B., and that custody arrangement remained subject to further review and modification. Latoya moved the court for an "informal hearing" to determine whether a material change of circumstances had occurred to allow her to regain custody.

¶38. At the end of those hearings, the youth court found that there was a "substantial change of circumstances" since A.B.'s original placement with the Briscos because his mother, Latoya, was "no longer incarcerated, . . . gainfully employed, . . . ha[d] stable housing," and had "a bonded relationship with her son." Thus, the original reasons for the determination that A.B. was "neglected" and needed to be placed in his grandparents' temporary custody no longer existed. The court also found that it was in A.B.'s best interest to return to his mother's care, custody, and control.

¶39. Latoya was fully released from MDOC's custody and had nothing but good reports from her former probation officer. She testified extensively about her housing and employment and her availability for her son for school drop-offs and pick-ups. A.B. testified that he loved his mother and was not afraid of her, as some witnesses testified. The youth court judge heard the parties' testimony and determined that some of the Briscos' witnesses were not credible and that the Briscos were "filled with animosity" toward Latoya. As the trier of fact, the judge was in the best place to assess witness credibility and demeanor.

¶40. The Briscos argue that Latoya did not meet her burden of proof regarding her ability to care for A.B., specifically pointing to Latoya's documented mental illnesses and alleged

12

threatening or volatile behavior.[3] However, their argument is based on the credibility of witnesses, and it was the youth court's purview to determine which of the witnesses she found more credible. The court found that no one other than her family testified that Latoya's mental health was not under control or that she was not taking it seriously. There is nothing in the record from which we could conclude differently.

¶41.    We cannot say the youth court judge erred by determining that there had been a material change in circumstances since the original temporary custody order or that it was in A.B.'s best interest to return to Latoya's custody.

## II.    Releasing CPS

¶42.    The Briscos argue that the court erred by removing CPS from monitoring Latoya after A.B. was given back to her. They argue that Mississippi Code Annotated section 43-21-613 requires that "reasonable efforts have been made to address the conditions that led to the child's removal and that continued monitoring is no longer necessary to protect the child's welfare." While this language is not found in the cited section, the Briscos' reliance on it is also misplaced.

¶43.    Nothing in that statute required CPS to monitor Latoya and A.B. In fact, the statute suggests that reviews and CPS supervision are not required in "those cases in which the court has granted durable legal custody. In such cases, the Department of Child Protection Services shall be released from any oversight or monitoring responsibilities, and relieved of physical

---

[3] The Briscos allege facts that are not in the record pertaining to alleged behavior after the youth court's final ruling and while the case was pending on appeal. We cannot consider facts outside the record and strike any exhibit included in support of those facts. *See* Appellant's Br. at 11.

13

and legal custody and supervision of the child." Miss. Code Ann. § 43-21-613(3)(d). As discussed, the temporary custody order was essentially a grant of durable legal custody.

¶44. The cases that the Briscos rely on are also distinguishable. In *Kevin*, CPS was involved in *Kevin* from the outset; it was CPS who initially removed the child from the mother's custody. *Kevin*, 341 So. 3d at 1016 (¶2). In *In re N.M. v. Mississippi Department of Human Services, Marion County*, 215 So. 3d 1007 (Miss. Ct. App. 2017), the child at issue was placed into state custody upon birth because seven of her siblings had been adjudicated as "neglected" before she was even born. *Id*. at 1008 (¶1). Neither of these cases support the Briscos' argument that the youth court erred by not requiring CPS to monitor Latoya after regaining custody of A.B. In the present case, CPS became involved only after Latoya's motion to regain custody at the request of the youth court judge "to complete background checks on all participants involved and conduct a walkthrough" of Latoya's new home.

¶45. Given that there is no statutory requirement that CPS monitor Latoya after regaining custody, we cannot say the court erred by releasing CPS from further involvement with Latoya and A.B.

### III. Denying a Continuance

¶46. The Briscos argue that the youth court reversibly erred by denying their motion for a continuance to subpoena Roscoe Gammill, who had been  Latoya's probation officer before Eric Proctor. The grant or denial of a continuance is reviewed for an abuse of discretion, and we will not reverse the trial court "unless the decision results in manifest injustice." *Johnson v. Johnson*, 281 So. 3d 70, 74 (¶14) (Miss. Ct. App. 2019). "There is no mechanical test for

determining whether a continuance should be granted, and the circumstances of each case must be carefully examined, especially the reasons presented to the trial judge at the time the request is denied." *Id.*

¶47. There is no evidence that the youth court abused its discretion in denying the motion. During the January 24 hearing, the parties disputed whether Latoya had left the state without permission while on probation under another officer's supervision. But at the end of the hearing, the parties all rested, and the youth court announced that the matter was under advisement. Later, on January 31, the Briscos sought a hearing to present evidence to impeach Latoya's testimony that she had never left the state without permission.

¶48. The Briscos' attorney explained that he had contacted MDOC and found Latoya's probation officer Roscoe Gammill, but he was not present to testify. Instead, counsel had Gammill on the phone. The youth court declined to speak to Gammill on the phone but recessed to allow the Briscos to have Gammill testify via Zoom. But after the recess, the Briscos' counsel announced that Gammill did not want to testify. So the youth court judge told him that he could subpoena Gammill for "another day because this has been a complete waste of your time and the court's time." The court also noted that the case was already finalized and under advisement, but she told counsel if he needed to get the witness there, he could request another date and have the witness ready next time.

¶49. But on February 26, the day before the scheduled hearing for Gammill's testimony, the Briscos' counsel filed a motion for a continuance. During a telephone conference with all parties, the court asked why counsel had asked for a continuance for a court date he had

15

previously agreed to. Counsel claimed that he had a previously scheduled trial date in another county and had misread his calendar. Counsel also admitted that he had not subpoenaed Gammill yet.

¶50. The youth court judge denied the motion for a continuance and stated that she believed counsel was attempting to delay the proceedings. She noted that the matter had been going on for more than six months and that it was over a month since she had taken the case under advisement. She told the parties to be present the next day for the hearing as scheduled.

¶51. Gammill did not appear at the hearing. The Briscos' counsel did, and he made a proffer of Gammill's testimony. Counsel also provided documentation proving his case in Jefferson County, which was why he asked for the continuance. But when the court examined the documents, she determined that the hearing in Jefferson County was scheduled *after* the parties had set the February 27 hearing, despite counsel knowing that the hearing for him to present Gammill's testimony was scheduled for February 27.

¶52. Given these facts, it was not an abuse of discretion for the youth court judge to deny the Briscos' motion for a continuance. Counsel was not prepared at the January 31 hearing and was advised to subpoena his witness. He did not subpoena the witness and then tried to get yet another continuance based on a court date scheduled after the youth court matter. Nor is there any evidence that the denial caused a manifest injustice to the Briscos. The purported testimony would have potentially tarnished Latoya's credibility, but given the record and the court's remarks about the Briscos' credibility, we cannot say that the testimony would have changed the outcome.

16

**CONCLUSION**

¶53. The Warren County Youth Court's decision to return custody of A.B. to his mother, Latoya, is supported by substantial evidence. There was a material change in circumstances since A.B. had been placed in the Briscos' temporary custody, and substantial evidence supports the youth court's finding that it was in A.B.'s best interest to return to his mother's custody. The youth court was not required to have CPS monitor Latoya's custody of her son. Finally, the youth court did not abuse its discretion in denying the Briscos' motion for a continuance following the resting of the parties.

¶54. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**