# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CP-00451-COA

IN THE INTEREST OF D.K., A MINOR, D.K., A **APPELLANTS**
MINOR, L.K., A MINOR, AND D.K., A MINOR:
D.W.K. AND L.K.K.

v.

YOUTH COURT OF LINCOLN COUNTY, **APPELLEE**
MISSISSIPPI

| | |
|---|---|
| DATE OF JUDGMENT: | 12/05/2018 |
| TRIAL JUDGE: | HON. BRAD RUSSELL BOERNER |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY YOUTH COURT |
| ATTORNEYS FOR APPELLANTS: | D.W.K. (PRO SE) |
| | L.K.K. (PRO SE) |
| ATTORNEYS FOR APPELLEE: | GREGORY MALTA |
| | JARED FRANK EVANS |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 07/25/2023 |
| MOTION FOR REHEARING FILED: | |

## CONSOLIDATED WITH

## NO. 2020-CP-01307-COA

IN THE INTEREST OF D.K., A MINOR, D.K., A **APPELLANTS**
MINOR, L.K., A MINOR, AND D.K., A MINOR:
D.W.K. AND L.K.K.

v.

YOUTH COURT OF LINCOLN COUNTY, **APPELLEE**
MISSISSIPPI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/10/2020 |
| TRIAL JUDGE: | BRAD RUSSELL BOERNER |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY YOUTH COURT |
| ATTORNEYS FOR APPELLANTS: | D.W.K. (PRO SE) |
| | L.K.K. (PRO SE) |

ATTORNEYS FOR APPELLEE:        GREGORY MALTA
                               JARED FRANK EVANS

NATURE OF THE CASE:            CIVIL - CUSTODY
DISPOSITION:                   AFFIRMED - 07/25/2023
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     L.K.K. (Louis) and D.W.K. (Donna) had five children during the course of their marriage.[1]  In July 2016, the Mississippi Department of Child Protection Services received a report that four of the children were neglected or abused and began an investigation.  The investigation quickly revealed allegations of sexual abuse as well.  After a lengthy pre-trial procedural history, an adjudication hearing was held in the Lincoln County Youth Court, and all four children were adjudicated abused or neglected in December 2018.  The court's order awarded physical custody to the children's maternal aunt.  Almost two years later in November 2020, the court denied motions to consider new evidence.  Louis and Donna have appealed from both orders, citing numerous procedural and evidentiary issues.  Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Louis and Donna (Appellants) were married in 1994 and had five children together—Alexis, Brianna, Chris, Daisy, and Ethan.[2]  The family lived in Lincoln County,

---

[1] We use fictitious names for readability.

[2] We use pseudonyms to protect the identities of the children.  The first letter of the children's names progresses alphabetically, indicating their ages from eldest to youngest. In other words, Alexis was the eldest female, followed in age by Brianna, Chris, Daisy, and then Ethan.  When the initial report was made, Alexis was an adult, Brianna was seventeen

2

Mississippi. Alexis was over the age of eighteen at the time of these proceedings and was not part of the youth court actions.

¶3.    In July 2016, a report was made to the Mississippi Department of Child Protection Services (CPS) concerning the "disarray" of the parents' home. Specifically, the report alleged that "the home [was] infested with roaches . . . [and had] holes in the wall . . . [and] mol[d] in the home[.]" There was "a concern [of] contamination in the home due to raw sewage[,]" "the kitchen sink [had] fall[en] in[,]" and there were "extension cords all over the home[.]" The report clarified that the home had been in these conditions for "about eight years." At the time of the report, Donna and the children had been staying with the children's maternal aunt for about a month. The reporter disclosed, however, that "the mother has been threatened by the father and may take the children back into these conditions." Soon after, the same reporter divulged additional allegations that Louis had exposed the children to pornography.

¶4.    The children were taken to the Southwest Mississippi Children's Advocacy Center (CAC) for a forensic interview on August 3, 2016.[3] The middle child, Chris, "could not participate . . . due to developmental delays," but the other three minors were able to be

_____

years old, Chris was eleven years old, Daisy was nine years old, and Ethan was four years old.

[3] At the adjudication hearing, video recordings of these interviews were entered into evidence. At a subsequent hearing, however, the youth court explicitly stated that it never watched any of the videos. Since the court did not rely on the videos, despite those being entered into evidence, any mention of and quotes from the interviews in this opinion are taken from the forensic interview reports provided by the CAC, which were also entered into evidence and reviewed by the youth court in making its determination.

interviewed. Brianna, the eldest of the three children interviewed, detailed numerous instances of abusive behavior from her parents. She indicated that Louis was "very mean to [the children] and [their] mother." She told the interviewer that both Donna and the children live in the house where "roaches and rats" would "crawl[] on them in their sleep." She stated their father lived alone in a camper in the backyard away from these conditions. Further, "her father makes her mother get on her knees in front of him to beg for food for the family[,]" makes her mother "have sex with [him] in order to get money to pay for things[,]" and he has "burned their coats in the winter." As to the sexual abuse, she had not experienced it firsthand. She was able to say, however, that "her father makes the younger siblings watch him and their mother have sex and . . . pornography" and that she had seen "her younger siblings 'humping' things[] and touching themselves" inappropriately.

¶5.     The youngest female child, Daisy, disclosed that she "has to watch out for her daddy." Her father "touched on her pee pee and her breasts," and her parents would "get[] naked and do[] nasty things." She continued that "her mommy would get naked[,] . . . and her daddy [would] rub[] her [mother's] butt[,]" and he would try "to touch her too, but she kept running." She stated that her father had touched her younger sibling, Ethan, and that she would "try to get [him] away." She also stated "her daddy was mean to her mommy" and described in detail seeing "movies when people [take] their clothes off."

¶6.     The youngest of the children, Ethan, stated in his interview that his father had tried to touch his "pee pee" and would "try to get me to touch him." He also said that he and his father would "touch Mommy together."

¶7. The Lincoln County Youth Court entered intake orders for all four children on August 30, 2016, as well as a custody change order and emergency custody order. In addition, a guardian ad litem (GAL) was appointed to the case.[4] On September 13, 2016, the county's prosecuting attorney filed a petition in the youth court alleging the children were neglected or sexually abused under the Mississippi Youth Court Act.[5]

¶8. After the initial forensic interviews and intake orders, this case has a long and winding legal procedural history. The case started on August 30, 2016, and a final custody order was not entered until December 5, 2018. Most of the delays occurred because Donna and Louis went through numerous lawyers, which resulted in numerous continuances. The GAL asked for a continuance to further investigate. Scheduling conflicts necessitated continuances. A brief summary of that procedural history follows as necessary to discuss the issues on appeal.

¶9. An adjudication hearing was initially scheduled for September 27, 2016. Louis's counsel requested a continuance. The youth court granted the request and rescheduled the hearing for November 1, 2016. That day, the matter was continued again and set for a hearing on January 17, 2017, "so that the [youth c]ourt may have sufficient time to review the voluminous records submitted on this date." The GAL agreed to this continuance, stating that "the best interests of the minor children shall be served by continuing this matter."

---

[4] "The court shall appoint a guardian ad litem for the child when custody is ordered or at the first judicial hearing regarding the case, whichever occurs first . . . in every case involving an abused or neglected child which results in a judicial proceeding[.]" U.R.Y.C.P. 13(a)(5).

[5] Brianna and Chris were alleged to have been neglected as defined in Mississippi Code Annotated section 43-21-105(l) (Rev. 2015). Daisy and Ethan were alleged to have been sexually abused as defined in section 43-21-105(n).

¶10.   In 2017, the adjudication hearing was continued four additional times.  First, after "a hearing was conducted on January 17, 2017[,] . . . testimony was not completed and a second day of hearing [was] necessary[,]" which was scheduled for February 28, 2017.  Before that date, though, Louis and Donna's attorney withdrew.  They obtained new counsel, who, on February 23, 2017, requested the hearing be continued because the parents "in the past couple of weeks . . . made several attempts to obtain their files from [their previous attorney]" and still had not received them.  Consequently, the hearing was rescheduled for May 31, 2017.  As that date approached, however, the parents' attorney claimed she had not been notified and had a scheduling conflict, so the hearing was rescheduled for October 3, 2017.  The hearing was then rescheduled for December 12, 2017, following a request from Louis's counsel "by and through the [p]rosecutor, that this matter be continued."  The parents later claimed they did not receive proper notice of this new date.

¶11.   The adjudication hearing was continued into the next year with a new date set for April 3, 2018.  Upon the youth court's own motions, the hearing was continued, first to June 5, 2018, and again to July 10, 2018.  The GAL made an ore tenus motion for a continuance with a new date being set for July 17, 2018.  On July 6, 2018, however, the youth court received a notice of withdrawal of Louis and Donna's attorney.  A substitution of counsel from Louis and Donna was filed for a new attorney of record.  Accordingly, the matter was continued and reset for September 18, 2018.

¶12.   On September 18, 2018, the hearing was continued for a final time after "the statute governing the confidentiality of the records in this matter . . . changed in a manner that shall,

and has, changed the manner in which this Court must rule on . . . the confidentiality of these records." The statute in question was Mississippi Code Annotated section 43-21-261 (Supp. 2017). The "change" was the addition of language regarding copies of records being made for counsel and rulings on the disclosure of "records involving children."[6] *See* 2017 Miss. Laws ch. 420, § 2 (H.B. 1213). The youth court's order therefore provided,

> [T]he CPS reports in this matter, as well as the Petition for Adjudication shall be copied and provided to the attorney for the mother and father . . . . The Prosecutor and GAL shall provide a list of any and all other records, reports or investigations that may be considered at the hearing on or before October 9, 2018. Thereafter, all records, reports, and/or investigations on that list shall be copied and provided to the attorney for the mother and father. All copies shall have the identity of the reporters redacted . . . . In the event that mother and/or father becomes a pro se litigant, the copies must remain in the pro se litigant's control and the pro se litigant shall not provide copies or access to any other person or entity without further Order.

¶13. The court also referenced the previous continuances, noting "that the majority of the Motions to Continue in this matter ha[d] been filed by the attorney(s) for the [parents]." As such, the order declared that a hearing was set for December 5, 2018, and the court would consider no further motions for continuance "outside of death or hospitalization of a party

---

[6] The statute defines "records involving children" as

> (i) [a]ll youth court records as defined in Section 43-21-251; (ii) [a]ll forensic interviews conducted by a child advocacy center in abuse and neglect investigations; (iii) [a]ll law enforcement records as defined in Section 43-21-255; (iv) [a]ll agency records as defined in Section 43-21-257; and (v) [a]ll other documents maintained by any representative of the state, county, municipality or other public agency insofar as they relate to the apprehension, custody, adjudication or disposition of a child who is the subject of a youth court cause.

Miss. Code Ann. § 43-21-105(u).

or counsel." Shortly after, the parents' third attorney withdrew from the matter, and the parents decided to move forward pro se.

¶14.   In sum, the adjudication hearing was ultimately set for twelve different dates, due mainly in part to motions filed by the parents for a variety of reasons previously discussed. The adjudication hearing was finally held on December 5, 2018.

### A.      Adjudication Hearing

¶15.   Donna filed for divorce from Louis two months prior to the adjudication hearing. Louis appeared for the December hearing despite filing a motion that same morning to terminate his parental rights. In his own words, he just "want[ed] to see how it turn[ed] out." Louis, however, elected to leave toward the beginning of the second witness's testimony. Donna, on the other hand, was present for the entirety of the hearing, representing herself pro se.

¶16.   The youth court began the hearing by addressing the recent change made to Mississippi Code Annotated section 43-21-261 (Rev. 2019), explaining that the newly discoverable records were made available "on or about September 18, 2018[.]" The records were held with Deputy Clerk Renee Britt, who was then called to testify. Britt explained that she had contacted Louis several times to let him know copies of the record were available to be picked up in the clerk's office. Louis came to review them only once—the day before the adjudication hearing—and did not receive any of the copies. Accordingly, the youth court found that copies of the record had properly been made available for "a period of six

8

weeks plus," and neither parent chose to obtain them.[7]   The court continued with the adjudicative hearing.

¶17.    The State then began calling witnesses to testify, starting with Nancy Kelly, the Mississippi CPS Area Social Work Supervisor. The first report was filed on July 29, 2016; Kelly became the case supervisor on May 15, 2017.  Kelly recounted the initial report made to CPS, which alleged neglect due to the "disarray" of the home, citing "holes in the wall" and "mold in[side]."  Following this report, additional allegations of sexual abuse and physical abuse were made.  Donna, to Kelly's knowledge, had not attended any parenting classes, anger management classes, or family counseling with the children.  Donna had not had any overnight visits with the children, either.  Kelly agreed with the prosecutor that there were "substantiated physical abuse allegations" involving Donna.   However, she recommended the children be placed with their mother.  Kelly was the only witness who recommended this course of action.

¶18.    The State's next witness was Jade Douglas, a forensic interviewer with the CAC who interviewed Brianna and Daisy as part of the investigation.  Douglas testified as to both girls' demeanor and statements they made in their interviews.  She testified that Brianna's interview was consistent with a child who had experienced neglect and domestic violence and had witnessed sexualized behaviors of her younger siblings.  She further testified that Daisy's interview was consistent with that of a child who had been sexually abused. Douglas stated that she saw nothing in her interviews to indicate that either child was untruthful in

<hr>

[7] In this finding, the youth court declared that any motion to dismiss or motion to compel based on this issue was denied based on that information.

9

their answers. Upon cross-examination by the GAL, Douglas testified that she recommended no contact with Louis and no contact with Donna because she had not exhibited any "protective capacities" for her children.

¶19. Trisha Artigues, another forensic interviewer with CAC, was then called to testify. Artigues determined that Chris was too developmentally delayed to be interviewed, so she only interviewed Ethan. At the adjudication hearing, Artigues was able to testify as to certain statements made in this interview—specifically, "his [d]ad trying to touch him" and "sexual touching with his [m]om." Because of his age at the time, though, Artigues was unable to gather full details of the sexual touching. Overall, she found that Ethan's behavior was consistent with that of a child who was sexually abused.

¶20. Finally, the State called Donna as a witness. She vehemently denied any kind of abuse occurring in the household. She was questioned as to why, then, she had filed for divorce from Louis based on irreconcilable differences *or* habitual cruel and inhuman treatment. Donna explained that she "felt it was cruel" when Louis told her not to do certain things and "felt [it] was inhumane" when they would argue over him eating certain foods due to his medical problems. The State delved further, showing specific instances in her complaint for divorce where she alleged systematic, continuous verbal and emotional cruelty, and inhuman abuse from Louis. She again referred to them arguing over his eating habits and him not listening to her as her idea of cruel and inhuman treatment, insisting that it had never gone further than that. She testified that she was aware of Louis filing a motion to terminate his parental rights and believed it was in everyone's "best interest" to have nothing else to do

10

with him. When pressed as to why this was, since she had been so insistent that her husband had not been abusive toward anyone, she answered that she just wanted "a clean slate."

¶21. During cross-examination, however, Donna admitted that Louis was controlling and aggressive. She also detailed her current way of life, maintained by "get[ting] donations . . . from friends and family" and stated that she had been trying to get a job for months. Donna saw no issue with this clear instability as far as the children were concerned. She closed her testimony with a claim that "all this happened because of money."

¶22. The GAL, Jason Tate, then called witnesses, beginning with Anne Craig. Craig provided therapy to the children through the CAC once the abuse allegations were made. The children had disclosed further instances of abuse in these sessions. Craig testified as to the children's feelings of stress and fear surrounding visitation with their parents, including being worried they would "get hurt again." She also mentioned that the children seemed to be afraid of Donna *and* Louis; even though Donna had not allegedly abused any of them, she had been present for Louis's abusive behavior and had not protected the children. Craig's reports were entered into evidence. Donna cross-examined Craig, largely asking whether she had "proof" of the abuse, specifically the allegation that Louis had "put his pee-pee in [Ethan's] butt[.]" Craig stated that she only had the statement, but that she typically based her reports on such statements and symptoms exhibited by the children. As such, she determined the children's responses were consistent with children who had been abused.

¶23. Next to testify was Brianna, who stated she was there "to make sure that [her] siblings are safe; that they never have to be hurt ever again." She recounted the pornography her

11

father had exposed the children to and that her mother "knew about all of it." She discussed that her parents would "just come in and just start . . . having sex, and [her] father would get very, very angry when [they] tried to leave or tried to get our younger siblings to leave." She also testified that Louis would "masturbate in front of the [the children]." Additionally, she recounted an instance of abuse from her childhood in which her father "press[ed] his fingers inside me and in my vagina[.]" She called "for [Donna] to help [her] . . . and [Donna] acted like nothing was happening." She also testified that her mother would make Alexis "brush her pubic hair" when they would take baths together. On cross-examination, Donna asked the child why she had never come forward with allegations of abuse until now. She replied, "because you said that [people] would think that I'm a dirty person."

¶24.    Alexis, the eldest child, testified next. She also testified seeing her parents have sex "out in the open[,]" her father "masturbat[ing] in front of [them,]" and "show[ing her] siblings porn." He had exposed Alexis and Brianna to pornography, as well, but "as [the girls] got older, he stopped showing [them], and . . . continued to show [the] younger siblings." Further, she explained that her mother, Donna, "would take [her] to [Louis], and he would put his penis in [her] butt." He would also "put his fingers in [her] vagina" and "put his penis in [her] mouth." Her mother would witness these events and "she wouldn't do anything . . . it was like that all the time." In addition, there were instances where Louis would give the children a chance to "get allowance" by putting money in his underwear and placing the larger bills "in between the buttons right in front of his penis and then [they]'d have to pull it out of his underwear." She also testified that Donna "would make [them] rub

12

the hair on her vagina, like when [they] would take baths." Alexis further discussed her current status as a student at Alcorn State University and stated that her father had followed her to her dorm once and got out of his car to just "stare" at her. She mentioned that her mother was a student at Alcorn, as well, enrolling herself in a class that Alexis was taking. Alexis subsequently withdrew from the class.

¶25. Finally, Tate testified in his capacity as the GAL. He discussed interviewing twelve different witnesses and reviewing all of the medical records, CAC reports, and DHS records in coming to this conclusion. His final reports were entered into evidence with his testimony. These reports reiterated several statements made by the children in their CAC interviews. However, he also included additional allegations, such as Ethan telling his siblings that "[Louis] put his pee-pee in [his] butt" and Daisy telling her aunt that "[Louis] would hold her down and put his pee pee in her mouth." His report also reflected that both parents were convinced that "these allegations were made up by [the children's maternal aunts] because they wanted to keep the money the children received." Tate opined that the children had been abused and neglected. At the conclusion of Tate's testimony, the youth court adjudicated the children "to be both sexually abused and neglected."

### B. Disposition Hearing

¶26. Following the children's adjudication, the parties moved immediately to the disposition phase of the proceedings. Tate was asked by the youth court to give his recommendation as to custody. He recommended custody of the children be placed with their maternal aunt. Counsel for the maternal aunt advised the court that her client wanted

13

to continue caring for the children and did not want either parent to have any contact with the children "in accord with the GAL's recommendation."

¶27. The youth court's disposition order mandated that custody would remain with CPS and placement would remain with the children's maternal aunt, with the goal of granting durable legal custody to her in the future. In addition, a no-contact order was entered for both parents. On December 6, 2018, Louis filed a motion in the trial court to "void" his previous motion terminating his parental rights. That same day, Donna withdrew her petition for divorce from Louis, so the two appeared to collaborate, pro se, on their separate appeals. They filed a notice of appeal on December 21, 2018. The record was designated on February 5, 2019.

### C. Appeal

¶28. The full procedural history on appeal is not necessary to ultimately resolve the issues. We note that the matter reached this Court four years after the adjudication and disposition orders were entered due to ten separate motions filed by the Appellants, some of which included "strik[ing] the Appellee's brief[,]" "revers[ing] orders from the youth court[,]" and additional "requests for clarification." Two additional hearings, one on November 10, 2020, and another on April 27, 2021, were held in the youth court upon order of the Mississippi Supreme Court to address a number of those motions, including requests to supplement the record and consider new evidence. The Appellants' efforts were fruitless, though, as those motions were denied by the youth court. The November 2020 order was appealed from, and the two appeals have been consolidated here.

14

¶29.    This Court has before it seven open motions[8] assigned by the Supreme Court for

"consideration on the merits of the appeal." After due consideration, this Court denies each

of those motions and now addresses the Appellants' arguments on appeal as to whether the

youth court had substantial evidence to support its adjudication and disposition orders.

## STANDARD OF REVIEW

¶30.    "The appellate standard of review for youth court proceedings is the same as that

which [this Court] appl[ies] to appeals from chancery court." *A.B. v. Lauderdale Cnty. Dep't*

*of Hum. Servs.*, 13 So. 3d 1263, 1266-67 (¶14) (Miss. 2009) (citing *B.R.C. v. State* (*In re*

*S.C.*), 795 So. 2d 526, 529 (¶11) (Miss. 2001)).

> This Court will not disturb a chancellor's findings unless they were manifestly
> wrong or clearly erroneous, or the chancellor applied an erroneous legal
> standard. Chancellors are afforded wide latitude in fashioning equitable
> remedies in domestic-relations matters, and their decisions will not be reversed
> if the findings of fact are supported by substantial credible evidence in the
> record. When reviewing a chancellor's decision, we will accept a chancellor's
> findings of fact as long as the evidence in the record reasonably supports those
> findings. The chancellor's interpretation and application of the law is reviewed
> de novo.

*Kay v. Kay*, 352 So. 3d 198, 203 (¶17) (Miss. Ct. App. 2022) (quoting *Stuckey v. Stuckey*,

341 So. 3d 1030, 1036 (¶13) (Miss. Ct. App. 2022)). Further, "[t]his Court's standard of

---

[8] These motions follow: (1) Motion to Reverse the April 27, 2020 Youth Court Order #2022-23 (Jan. 4, 2022); (2) Motion to Reverse both the November 10, 2020 Youth Court Order and the April 27, 2021 Youth Court Order #2021-2976 (Oct. 15, 2021); (3) Memorandum and Request for Clarification Regarding the Appellee Brief #2021-1770 (Jun. 29, 2021); (4) Motion to Strike the Appellee Brief #2021-1210 (May 6, 2021); (5) Motion to Reverse the November 10, 2020 Lincoln County Youth Court Order #2021-1040 (Apr. 20, 2021); (6) Motion to Reverse All of the Orders of the Youth Court Referee and Return Custody of the Children to the Appellants #2020-3568 (Nov. 5, 2020); and (7) Memorandum and Request for Clarification #2020-3232 (Oct. 1, 2020).

review of . . . youth court cases is limited." *In re L.H.*, 87 So. 3d 1139, 1144 (¶22) (Miss. Ct.

App. 2012) (citing *In re A.J.M.*, 911 So. 2d 576, 579 (¶10) (Miss. Ct. App. 2005)).

## ISSUES ON APPEAL

¶31.    The issues on appeal brought forth by the Appellants in separate pro se briefs are

convoluted.  Their complete issue statements are quoted verbatim below.  Donna's issues,

as listed in her brief, are listed as "propositions" and read as follows:

> [(1)] The Referee lacked jurisdiction to initiate a youth court cause against the
> biological parents when the youth court did not have any counts of abuse,
> neglect or delinquency that were alleged by a petitioner against the parents or
> against their four minor children.

> [(2)] The referee erred when he relied upon the testimony of the GAL attorney
> as the basis for the December 5, 2018 Disposition Order instead of relying [on]
> testimony based on credible evidence presented at the hearing.

> [(3)] The Referee erred in his decision to proceed with the Adjudication
> Hearing against the [Appellants] when he did not establish jurisdiction through
> proper service of process.

> [(4)] The referee erred when he declared that the 3rd adjudication hearing date
> was an entirely new trial without the youth court records to justify doing so.

> [(5)] The Referee's decision to adjudicate the children is manifestly wrong,
> clearly erroneous and contrary to the weight of the evidence. Furthermore, the
> referee clearly disregarded that MDCPS Lincoln County Supervisor Nancy
> Kelly filed two court reports in youth court which stated that there is no
> evidence to support any allegations and to return the children.

> [(6)] The Referee erroneously proceeded with ordering that a new trial take
> place when no one submitted a motion for a new trial according to the record.

> [(7)] The Referee erroneously relied upon youth court records that are not filed
> in the docket as the basis for youth court orders.

¶32.    Louis's issues, as listed in his brief, read as follows:

16

[(1)] Whether the trial court errored in failing to require the video exhibit to be supplemented after the trial court did not deny [Donna]'s July 30, 2020 Motion To Supplement the Record.

[(2)] Whether the trial court errored in denying [Donna]'s 2nd Motion To Supplement the Record.

[(3)] Whether the trial court erred when it made the finding that the youth court has subject matter jurisdiction without having signed-sealed requests for petition for Adjudication filed in the appeal record for cause #2020-CP-01307 or for cause #2019-CP-00451.

[(4)] Whether the trial court erred by allowing the youth court clerk to file an incomplete and noncompliant appeal record by not requiring the youth court clerk to file a Notice of Completion and Certificate of Compliance regarding the record for 2019-CA-451.

[(5)] Whether the trial court errored by denying [Louis]'s Memorandmn and Request For Clarification in the November 10, 2020 Youth Court Order.

¶33. Some of the issues put forth by both briefs are not outcome-determinative to the ultimate issues. We combine their issues and address what can best be discerned as four issues: (1) jurisdiction, (2) service of process, (3) evidentiary support to justify the award of custody of the four minor children to a maternal aunt (away from their natural parents), and (4) supplementation of the record. Finding no error, we affirm in both appeals.

### DISCUSSION

### I.    Jurisdiction

¶34. Appellants first take issue with this matter being before the Lincoln County Youth Court. Mississippi law is clear that youth courts "shall have exclusive original jurisdiction in all proceedings concerning a delinquent child, a child in need of supervision, *a neglected child, an abused child or a dependent child*." Miss. Code Ann. § 43-21-151(1) (Rev. 2021)

17

(emphasis added). While there are exceptions to this rule, none are applicable here.[9]

Additionally, youth court "[p]roceedings commence when a report or complaint of a child within the jurisdiction of the youth court requires an action by the youth court or by the chancery court or by a referee appointed . . . or by a designee appointed." U.R.Y.C.P. 2(b). Here, the youth court's jurisdiction commenced on August 30, 2016, when it entered intake orders, emergency custody orders, and custody-change orders. The Lincoln County Youth Court's jurisdiction over this case was proper, and the court made no error in proceeding with the case.

## II.     Service of Process

¶35.   The Appellants also allege error in the youth court's service of process, claiming they did not receive notice for several dates set for the adjudication hearing. As the Youth Court

---

[9] Those exceptions follow:

(a) Any act attempted or committed by a child, which if committed by an adult would be punishable under state or federal law by life imprisonment or death, will be in the original jurisdiction of the circuit court;
(b) Any act attempted or committed by a child with the use of a deadly weapon, the carrying of which concealed is prohibited by Section 97-37-1, or a shotgun or a rifle, which would be a felony if committed by an adult, will be in the original jurisdiction of the circuit court; and
(c) When a charge of abuse of a child first arises in the course of a custody action between the parents of the child already pending in the chancery court and no notice of such abuse was provided prior to such chancery proceedings, the chancery court may proceed with the investigation, hearing and determination of such abuse charge as a part of its hearing and determination of the custody issue as between the parents, notwithstanding the other provisions of the Youth Court Law. The proceedings in chancery court on the abuse charge shall be confidential in the same manner as provided in youth court proceedings.

Miss. Code Ann. § 43-21-151(1)(a)-(c).

Act requires, "[s]ummons shall be served not less than three (3) days before the date set for the adjudicatory hearing of proceedings concerning the child." Miss. Code Ann. § 43-21-507(1) (Rev. 2021). The record is extremely clear on this issue, showing that the Appellants were properly noticed for the initial hearing date of September 27, 2016. Further, the record evidences that the Appellants did not properly raise this issue before the youth court either by motion or objection during the adjudication hearing. "A contemporaneous objection is required to preserve an error for appellate review." *Miss. Baptist Foundation Inc. v. Est. of Matthews*, 791 So. 2d 213, 217 (¶16) (Miss. 2001) (citing *Smith v. State*, 530 So. 2d 155, 161-62 (Miss. 1988)). This issue is therefore waived. Notwithstanding the waiver, this issue lacks merit as well.

¶36. The Appellants were properly served with process for the first-scheduled adjudication hearing on September 27, 2016, that was postponed by order of the Lincoln County Youth Court. That order, and every order for continuance following, dictated that "the previous process of the Court shall remain in full force and effect and that all persons previously served with process to attend the hearing originally set for [date] be and hereby are ordered to attend the hearing set for [continued hearing date]." Even so, the Appellants were still provided additional notice for several of the new hearing dates. In fact, the Appellants requested most of the continuances.

¶37. Further, Donna also appeared and represented herself pro se at the adjudication hearing held on December 5, 2018. She fully participated in that hearing, cross-examining witnesses and presenting arguments to the youth court. She made no objection to service of

19

process on the record. "Where one participates in a matter, presents evidence, calls witnesses, and cross-examines witnesses, she subjects herself to the court's jurisdiction and waives all objections based on improper or insufficient service of process." *Price v. McBeath*, 989 So. 2d 444, 452 (¶31) (Miss. Ct. App. 2008) (citing *Isom v. Jernigan*, 840 So. 2d 104, 107 (¶9) (Miss. 2003)). Louis also made an appearance at this hearing following a motion to terminate his parental rights. He voluntarily chose to leave early at the beginning of the hearing when testimony started. Louis also never objected to the court's service of process at the adjudication hearing.

¶38. Moreover, the Youth Court Act allows "[a] party other than the child [to] waive service of summons on himself by written stipulation or by voluntary appearance at the hearing." Miss. Code Ann. § 43-21-507(2). That is precisely what Donna did during the course of this procedural history and at the adjudication hearing. She "freely, voluntarily, knowingly, and intelligently" signed an official waiver of process for adjudication. Nevertheless, the youth court still noticed her for many of the continued dates for the next scheduled hearing. For the aforementioned reasons, this issue is without merit.

### III. Evidentiary Support

¶39. The Appellants next allege that the youth court lacked the evidence to support its decision to maintain physical placement with the children's maternal aunt and custody with CPS. The Appellants argue that the youth court should have relied upon "testimony based on credible evidence" at the adjudication hearing. Essentially, the Appellants expected the youth court to rely solely upon the recommendation of Kelly, who testified on behalf of CPS

20

and stated the children should be returned to Donna. The Appellants' argument disregards the remaining evidence in support of the sexual abuse and neglect.

¶40. Before entering a dispositive order, the youth court was first tasked with the adjudication of the children. The children had been alleged as sexually abused and/or neglected. In terms of the Youth Court Act, sexual abuse is "obscene or pornographic photographing, filming or depiction of children for commercial purposes, or the rape, molestation, incest, prostitution or other such forms of sexual exploitation of children under circumstances which indicate that the child's health or welfare is harmed or threatened." Miss. Code Ann. § 43-21-105(n). A neglected child is defined by statute as "a child (i) [w]hose parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support . . . or (ii) [w]ho is otherwise without proper care, custody, supervision or support; or . . . (iv) [w]ho, for any reason, lacks the care necessary for his health, morals or well-being." Miss. Code Ann. § 43-21-105(l). In reaching a decision on the children's adjudication, the court "consider[ed] only evidence which ha[d] been formally admitted at the adjudicatory hearing." Miss. Code Ann. § 43-21-559(1) (Supp. 2016).

¶41. The youth court formally admitted, and thus considered, several forms of evidence in the adjudicative hearing. The court was provided with testimony from two of the Appellants' daughters. Brianna told the court her father would "masturbate in front of [the children]" and "just come in [with Donna] and . . . start . . . having sex" in front of the kids. She testified that her father had "press[ed] his fingers inside [her] and in [her] vagina" while she "called

21

for [her] mom to help . . . [while] she was in the room[.]" Her mother also made the children "brush her pubic hair" when everyone took baths together. Brianna further testified that the reason she had not spoken to anyone else about the abuse was "because [her mother] told [her] people would think that [she's] a dirty person."

¶42. Alexis also provided ample evidence for the youth court's consideration. She testified to witnessing her father, Louis, "masturbat[ing] in front of" the children, "show[ing her] siblings porn," and both parents having sex "out in the open." She testified that her mother "would take [her]" to her father, and "he would put his penis in [her] butt." Her father had also "put his fingers in [her] vagina" and "put his penis in [her] mouth." Alexis testified that while these sexual assaults were occurring, her mother "wouldn't do anything." Her mother would also ask the children to "rub the hair on her vagina" while they bathed together. Finally, she detailed the children's chance to "get allowance[,]" a process in which her father, Louis, would hide money in his underwear and would put the larger bills "in front of his penis" and the children would have to pull the money "out of his underwear."

¶43. The youth court did not rely on this testimony alone. The forensic reports from interviews with the CAC were reviewed, as well as testimony from the employees who conducted those interviews. Douglas, an employee with CAC, testified that the interview she conducted with Brianna was consistent with a child who had been neglected, and the interview with Daisy was consistent with a child who had been sexually abused. Artigues, another CAC employee, testified that her interview with Ethan was consistent with that of a sexually abused child. The youth court also heard testimony from the children's therapist,

22

who stated that the children were afraid when visitation with their parents approached because they were worried they would "get hurt again." Additionally, testimony and an official report from the appointed GAL were entered into evidence, both of which were founded upon extensive reviews of the children's history and interviews conducted with twelve different witnesses with knowledge. The youth court had sufficient evidence to support its decision in adjudicating the subject children sexually abused and neglected.

¶44. Once the children were adjudicated, the youth court proceeded to the disposition hearing. It received both CPS's recommendation and the GAL's recommendation. The GAL also testified on the record that he recommended, "the minor children stay with [their maternal aunt]" and that custody be kept with CPS until durable legal custody could be given to her. Counsel for the children's maternal aunt questioned Tate as to his recommendation for visitation, and he recommended no contact with Donna or Louis. The maternal aunt's counsel signaled to the court that her client agreed with Tate's recommendation. Soon after, the youth court entered its disposition order. We find that the court relied upon sufficient evidence in doing so.

¶45. The sexual abuse and neglect allegations against the Appellants were serious and of a continuous nature. "The paramount concern in determining the proper disposition is the best interest of the child . . . ." *In re S.A.M.*, 826 So. 2d 1266, 1274-75 (¶19) (Miss. 2002) (citing *Prante v. Beggiani (In re B.L.P.)*, 519 So. 2d 1208, 1213 (Miss. 1988)); *see also G.Q.A. v. Harrison Cnty. Dep't of Hum. Servs.*, 771 So. 2d 331, 336 (¶21) (Miss. 2000) (holding "the polestar consideration in determining disposition is the best interest of the

23

child"). Based upon the evidence provided in the GAL's report, and even in the CPS recommendation, the youth court had more than enough evidence to conclude that relative placement was in the children's best interest.

¶46. The youth court noted when announcing its decision that Donna's "questions [at the hearing] were devoted to her own self-protection and preservation" and that "[v]ery little was done or said with regard to [the] best interest of the children on her part[.]" As mentioned previously, Louis filed a motion to terminate his parental rights before the hearings and left soon after the adjudication hearing. Again, the key consideration in disposition orders "is the best interest of the child[ren], not reunification of the family." *In re S.A.M.*, 826 So. 2d at 1274 (¶19). We therefore find that the youth court's decision was not manifestly wrong or erroneous, was based upon substantial evidence, and favored the best interest of the children.

## IV. Supplementation of the Record

¶47. Finally, we address the Appellants' argument that the record must be supplemented with the videos of the children's interviews with the CAC. In supplementing the record, Mississippi Rule of Appellate Procedure 10(e) provides, "If any difference arises as to whether the record *truly discloses what occurred in the trial court*, the difference shall be submitted to and settled by that court and the record made to conform to the truth." M.R.A.P. 10(e) (emphasis added). And this rule should not be construed, "as empowering the parties . . . to add to . . . the record except insofar as may be necessary to convey a fair, accurate, and complete account of what transpired in the trial court with respect to those issues that are the

24

bases of appeal." M.R.A.P. 10(f).

¶48. The Appellants ask this Court to reverse the custody award of their children because the youth court failed to supplement the record on appeal with the videos of the CAC interviews. However, the video recordings of the children's interviews with CAC were part of the record on appeal. Additionally, the record is clear that the youth court expressly stated it did not utilize the recordings in reaching a final decision. The court did, however, utilize the forensic reports from these interviews along with the hearing testimony from the social workers who conducted them. As mentioned above, the youth court was also presented with testimony from two of the Appellants' children, a full report from the GAL, and testimony from other parties involved in the matter. The record on appeal was sufficient for this Court to determine that there was substantial evidence to support the youth court's decisions. The issue raised by the Appellants as to supplementing the record on appeal is without merit.

## CONCLUSION

¶49. For the foregoing reasons, this Court affirms the decisions of the Lincoln County Youth Court.

¶50. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**