# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00063-COA

**ASHLEY R.**                                                                          **APPELLANT**

**v.**

**WARREN COUNTY DEPARTMENT OF CHILD**                          **APPELLEES**
**PROTECTION SERVICES, BY ANDREA A.**
**SANDERS, COMMISSIONER, I.S., A MINOR,**
**M.E., A MINOR, M.A., A MINOR, AND M.L., A**
**MINOR, BY AND THROUGH THEIR NEXT**
**FRIEND, ANDREA A. SANDERS AND**
**MISSISSIPPI DEPARTMENT OF CHILD**
**PROTECTION SERVICES**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/15/2023 |
| TRIAL JUDGE: | HON. MARCIE TANNER SOUTHERLAND |
| COURT FROM WHICH APPEALED: | WARREN COUNTY YOUTH COURT |
| ATTORNEY FOR APPELLANT: | J. ALLEN DERIVAUX JR. |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KRISTI DUNCAN KENNEDY |
| |     BRANDON COLLIN SMITH |
| |     LINDSEY E. LAZINSKY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 03/24/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Ashley R. appeals the judgment of the Warren County Youth Court terminating her parental rights. She asserts that the youth court's decision is not supported by clear and convincing evidence and that the youth court failed to advise her of her rights as required by statute. We find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    Ashley R. and Jeremy R. are married and are the biological parents of four children: M.A., M.L., M.E., and I.S.[1]

¶3.    M.A. was born in October 2014 and tested positive for methamphetamine at birth. As a result, the Mississippi Department of Child Protection Services (CPS) (Hinds County) removed M.A. from her parents' care and placed her with her paternal grandparents. In December 2014, M.A. was returned to Ashley's care while Ashley was participating in a drug rehabilitation program.

¶4.    M.L. was born in November 2015 and also tested positive for methamphetamine at birth. However, CPS (Hinds County) allowed M.L. to remain in Ashley's custody.

¶5.    In December 2017, CPS (Hinds County) removed M.A. and M.L. from Ashley's custody based on reports of continued drug use and domestic violence. The children were again placed in the care of their paternal grandparents.

¶6.    M.E. was born in June 2018. In October 2018, CPS (Rankin County) removed M.E. from Ashley's custody following more reports of drug use and domestic violence. M.E. was placed with a family friend. M.A., M.L., and M.E. were all adjudicated as neglected. Around this time, the family friend raised concerns about possible sexual abuse of M.A. and M.L. by their paternal grandfather.

¶7.    In June 2020, M.A. and M.L. were returned to Ashley's care after Ashley spent about four months in a drug rehabilitation program.

¶8.    In November 2021, following a domestic altercation with Jeremy, Ashley went to

---

[1] We use abbreviated names and initials to protect the minors' privacy.

Haven House Family Shelter in Vicksburg. At Haven House, Ashley alleged that her daughters had been sexually abused by Jeremy's father and possibly by Jeremy.[2] In addition, M.E. made comments to a worker at Haven House suggesting sexual abuse by Jeremy's father. CPS (Warren County) removed the children from the paternal grandparents' home, where they were staying at the time, and placed them in foster care. The children also disclosed sexual abuse by the grandfather during interviews at a child advocacy center. In December 2021, the youth court adjudicated the children as sexually abused and adopted a permanency plan of reunification. By this time, Ashley was pregnant with I.S.

¶9. I.S. was born in June 2022. Later that month, CPS placed M.A., M.L., and M.E. in Ashley's care on a ninety-day home trial. During this period, Jeremy had supervised visitation. In August 2022, law enforcement notified CPS that there was a warrant for Jeremy's arrest due to a domestic violence incident involving Ashley. Ashley returned to Haven House; this was her fourth stay at Haven House. At a subsequent shelter hearing in youth court, evidence was presented of continuing domestic violence issues between Ashley and Jeremy. CPS allowed Ashley to return home with M.A., M.L., and M.E.; however, I.S. remained in CPS's custody.

¶10. In September 2022, all four children were placed in Ashley's custody for another ninety-day home trial. Jeremy had supervised visitation.

---

[2] Ashley reported that she had seen Jeremy masturbating in front of the girls. However, at the September 2023 hearing on the petition to terminate her parental rights, Ashley recanted that allegation. She said her memory of the incident was "foggy," and she attributed her prior allegation to her drug use and arguments between her and Jeremy. Additional testimony regarding alleged inappropriate behavior by Jeremy is discussed *infra*.

¶11.    Just eight days later, Ashley was involved in a car accident while all four children were in the car with her.  Ashley was charged with driving under the influence and child endangerment.  As a result, CPS terminated the trial home placement.  The children were adjudicated to be neglected and placed in foster care.  The permanency plan for all four children remained reunification.

¶12.    Ashley and Jeremy entered another rehabilitation program but only stayed for two weeks.  In November 2022, after missing multiple rehabilitation meetings, Ashley tested positive for methamphetamine.  Later that month, the youth court held a permanency review hearing and found that a permanency plan of reunification was "no longer appropriate."  The court found that a new permanency plan of adoption was in the children's best interests and directed CPS to initiate the process of filing a petition to terminate Ashley's and Jeremy's parental rights.  In December 2022, both Ashley and Jeremy entered another rehabilitation program, but they later left and failed to complete the program.  In February 2023, Ashley entered another rehabilitation program.  She did complete that program and returned home. Jeremy had been participating in drug court, but he was "revoked" and ordered to complete a short-term drug and alcohol program in the custody of the Department of Corrections.

¶13.    In April 2023, CPS filed a petition to terminate Ashley's and Jeremy's parental rights. The youth court held a hearing on the petition in September 2023.

¶14.    At the hearing, CPS social worker Lakisha Frye testified that Ashley and Jeremy had not visited the children for approximately one year.  Frye testified that the children "would tend to act out after visitation with [Ashley and Jeremy]," including "touching each other on

4

the genitals." Frye stated that the children were receiving therapy to address the sexual abuse and other trauma they had suffered and resultant behavioral issues. Frye said that Ashley and Jeremy both signed family service plans that required them to meet certain requirements, but they both "relapsed several times" and continued using drugs. Ashley and Jeremy both tested positive for methamphetamine again in November 2022. In addition, "domestic violence" incidents involving Ashley and Jeremy "continued throughout the case." Frye testified that the children were "thriving" in their foster homes and had bonded with their foster families.[3] Frye testified that she did not believe the children could be returned to Ashley and Jeremy and that Ashley and Jeremy had effectively abandoned or deserted the children by their conduct and their failure to commit to the responsibilities of parenthood.

¶15. Leigh Ann Cade, the court-appointed Guardian Ad Litem for the children, testified that it was in the children's best interests for the court to terminate Ashley's and Jeremy's parental rights immediately. Cade testified that Ashley had been using drugs and in and out of various drug rehabilitation programs "since 2014." Cade stated that Ashley had completed treatment programs multiple times, but "being able to maintain [sobriety] has always been the issue." Cade stated that Ashley and Jeremy "wanted to maintain a relationship with their kids," but they were "not taking care of" "their on-again, off-again drug use and domestic violence issues." Cade testified that all four children were doing well and were happy with their foster families, and the foster families communicated so that the girls could visit I.S. Although the girls were still displaying "some inappropriate sexual behaviors," they were

---

[3] M.A., M.L., and M.E. lived together with the same foster family. I.S. was with a different foster family.

receiving counseling.

¶16.  Jeremy testified that he had completed another ninety-day stay at a drug rehabilitation facility, but he relapsed in March 2023 after finding a substance in his truck that "triggered" him.  He admitted that he "licked" the substance, and "it was a little bit of meth."  Jeremy stated that he had been in six different rehabilitation programs—including three programs and drug court in the prior year alone.  Jeremy denied that he had ever sexually abused his children, but he admitted that he and Ashley "had suspicions" that his father had sexually abused the children.  Jeremy stated that they allowed the children to remain in his parents' care because CPS's investigative findings had "appeased" his concerns.

¶17.  Ashley testified that she had completed her most recent drug rehabilitation program, that she and Jeremy were still married, and that she wanted to resume visitation with her children and eventually regain custody of them.  She testified that she has been diagnosed with and prescribed medication for bipolar disorder.  Ashley acknowledged that M.A. and M.L. were born with methamphetamine in their systems.  She stated that she had been to rehabilitation "probably about seven times" as an adult.  She also acknowledged drug and alcohol use had led to domestic violence between Jeremy and her.  Ashley could not specify when she first suspected her children had been sexually abused.

¶18.  The foster mother to M.A., M.L., and M.E. testified that the girls were doing "pretty well" and had not engaged in any inappropriate sexual behaviors in a few months.  She stated that she and her husband were willing to adopt the three girls.

¶19.  Lastly, LaKeria Kaho, a community support specialist, testified that M.A. and M.L.

were doing well in their foster home and were no longer engaging in inappropriate sexual behaviors. Kaho testified that M.L., "along with [M.A.]," recently told her that Jeremy continued to "take baths" with them until "right before they were taken into [CPS] custody" and placed with their current foster parents. "[M.L.] said that [Jeremy] did not have on swimming trunks," and M.L. "saw his private area."

¶20. In December 2023, the youth court entered a final judgment terminating Ashley's and Jeremy's parental rights pursuant to Mississippi Code Annotated sections 93-15-115 and 93-15-121(c)-(f) (Rev. 2021). The court found that the children had all been adjudicated to be neglected children, that CPS had developed a service plan for reunification and had made diligent efforts to assist Ashley and Jeremy in complying with their plan, that Ashley and Jeremy had failed to substantially comply with the terms and conditions of their plan, and that terminating Ashley's and Jeremy's parental rights was appropriate because reunification was no longer a desirable outcome. *See* Miss. Code Ann. § 93-15-115. In addition, the court found four separate statutory grounds for terminating Ashley's and Jeremy's parental rights: (1) that Ashley and Jeremy were addicted to drugs and had failed to successfully complete treatment, (2) that they were unwilling or unable to provide reasonably necessary food, clothing, shelter, or medical care for the children, (3) that they had failed to exercise reasonable visitation with the children, and (4) that their neglectful or abusive conduct had caused, at least in part, an extreme deep-seated antipathy by the children toward them. *See* Miss. Code Ann. § 93-15-121(c)-(f). Ashley filed a notice of appeal. Jeremy also filed a notice of appeal but later moved to voluntarily dismiss his appeal. The Supreme Court

7

granted Jeremy's motion while noting that Ashley's appeal remained pending.

**ANALYSIS**

¶21. On appeal, Ashley argues (1) that there is not "clear and convincing evidence" of any grounds for termination of parental rights under section 93-15-121[4] and (2) that the youth court failed to advise her of her rights as required by Mississippi Code Annotated section 93-15-113 (Rev. 2021).

¶22. In youth court cases, "this Court's standard of review is limited." *In re S.A.M.*, 826 So. 2d 1266, 1274 (¶17) (Miss. 2002). The youth court's "findings of fact will not be overturned where they are supported by substantial evidence in the record, unless manifestly wrong." *Id.* This Court "asks not how we would have decided the case ab initio but whether there be credible proof from which a rational trier of fact may have found [grounds for termination] by clear and convincing evidence." *S.N.C. v. J.R.D. Jr.*, 755 So. 2d 1077, 1080 (¶7) (Miss. 2000) (other brackets omitted).

### I. Grounds for Termination

¶23. Ashley argues that the youth court's decision to terminate her parental rights is not supported by clear and convincing evidence. Ashley argues that although the youth court's judgment "lists, *among other grounds*, that [she] has failed to complete drug and alcohol treatment within a reasonable time" (emphasis added), by the time of trial she had completed a ninety-day treatment program and had remained drug-free for several months. Ashley further argues that although her "issues with substance abuse are evident," "the fact that she

---

[4] Ashley does not contest the youth court's findings that the requirements of section 93-15-115(a)-(c) were proven by clear and convincing evidence.

desires a relationship [with her children] demonstrates a lack of abandonment."

¶24. As noted above, the youth court found clear and convincing evidence of *four distinct* statutory grounds for terminating Ashley's parental rights. "Although the statutes provide several different reasons for termination, only one statutory ground is needed to justify termination of parental rights." *E.H. v. Lee Cnty. Dep't of Child Prot. Servs.*, 420 So. 3d 341, 351 (¶42) (Miss. Ct. App. 2025); *accord Bullock v. Miss. Dep't of Child Prot. Servs.*, 343 So. 3d 1079, 1086 (¶22) (Miss. Ct. App. 2022); *W.A.S. v. A.L.G.*, 949 So. 2d 31, 35 (¶11) (Miss. 2007).

¶25. The youth court found clear and convincing evidence of the following grounds for termination:

> (c)     The parent is suffering from habitual alcoholism or other drug addiction and has failed to successfully complete alcohol or drug treatment;
>
> (d)     The parent is unwilling to provide reasonably necessary food, clothing, shelter, or medical care for the child; reasonably necessary medical care does not include recommended or optional vaccinations against childhood or any other disease;
>
> (e)     The parent has failed to exercise reasonable visitation or communication with the child;
>
> (f)     The parent's abusive or neglectful conduct has caused, at least in part, an extreme and deep-seated antipathy by the child toward the parent, or some other substantial erosion of the relationship between the parent and the child[.]

Miss. Code Ann. § 93-15-121.

¶26. Although Ashley emphasizes that, by the time of trial, she had completed her most recent drug treatment program and had remained drug-free for a period of time, the fact

9

remains that Ashley repeatedly failed to complete drug treatment and continued to abuse illicit drugs, beginning at least with her initial encounters with CPS in Hinds County in 2014 and continuing into 2023. Ashley's drug use repeatedly endangered her children. Two of her children tested positive for methamphetamine at birth, and all four children were in the car with Ashley when she was in a wreck and arrested for driving under the influence and child endangerment. In addition, Ashley admitted that her and Jeremy's drug use led to domestic violence incidents while the children were present in the home. Throughout the history of her involvement with CPS, Ashley repeatedly failed to successfully complete drug rehabilitation programs and repeatedly tested positive for drugs. Given the evidence presented at trial, we cannot say that the youth court's findings regarding Ashley's drug addiction and failure to successfully complete drug treatment on this issue were "manifestly wrong." *In re S.A.M.*, 826 So. 2d at 1274 (¶17).

¶27. Moreover, Ashley does not address other grounds that the youth court found also justified termination of parental rights. Ashley's four children have spent much of their lives in CPS custody and have been repeatedly neglected and exposed to domestic violence, habitual drug use, and even sexual abuse. Ashley's drug use has repeatedly endangered their health and well-being. Given this evidence, we cannot say that the youth court clearly erred by finding that Ashley's neglect of the children had caused, at least in part, a substantial erosion of the parent-child relationship.

## II. Notice of Rights

¶28. Ashley also asserts that the youth court erred by not advising her of her rights at the

10

beginning of the hearing as required by Mississippi Code Annotated section 93-15-113(2)(a).

That statute provides:

> At the beginning of the involuntary termination of parental rights hearing, the court shall . . . explain to the parent the purpose of the hearing, the standard of proof required for terminating parental rights, and the consequences if the parent's parental rights are terminated. The court shall also explain to the parent:
>
> (i)    The right to counsel;
>
> (ii)    The right to remain silent;
>
> (iii)    The right to subpoena witnesses;
>
> (iv)    The right to confront and cross-examine witnesses; and
>
> (v)    The right to appeal, including the right to a transcript of the proceedings.

¶29.    In this case, the judge confirmed at the outset of the hearing that both Ashley and Jeremy were represented by *separate* counsel. During Jeremy's direct examination,[5] the judge seemingly realized that she had not advised Ashley and Jeremy of their rights. The judge halted Jeremy's testimony, advised him and Ashley of the purpose of the hearing, the burden of proof, their right to remain silent, and their right to appeal. Both Ashley and Jeremy affirmed that they understood the purpose of the hearing and their rights and that they had been represented by counsel throughout the proceeding. The hearing then continued.

¶30.    In *C.P. v. Lowndes County Department of Child Protection Services*, 349 So. 3d 1209 (Miss. Ct. App. 2022), parents argued that the youth court erred by "fail[ing] to inform them of *any* of their rights at the beginning *or at any point* during the termination hearing." *Id.* at

---

[5] Jeremy was the third of six witnesses. Ashley was the fourth witness.

11

1225 (¶48) (emphasis added). However, this Court held that "the court's failure to explicitly inform the parents of their rights" was harmless error because,

> throughout the proceedings, the parents were represented by a court-appointed attorney. At trial, the attorney cross-examined CPS's witnesses and called the father to testify. After the father testified, the attorney informed the court that the mother also wished to testify. In essence, the parents here exercised the rights they claimed the court failed to give them.

*Id.* Similarly, in *In re K.B.*, 424 So. 3d 908, 910-11 (¶¶14-17) (Miss. Ct. App. 2025), we held that the court's failure to explicitly inform the parent of her rights was harmless error because the parent was represented by counsel, exercised her rights, fully participated in the hearing, and was advised of her right to appeal at the conclusion of the hearing.

¶31. The same reasoning applies here. Ashley was represented by counsel at all times, she was advised of her rights prior to her testimony, and she exercised her rights, including her right to appeal. While we again remind our youth courts of the importance of advising parents of their rights at the *beginning* of the termination hearing, the deviation from the statute was harmless error on the facts of this case.

¶32. Because substantial evidence supports the youth court's findings and Ashley identifies no reversible error, the judgment of the youth court is **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**