# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00984-COA

J.R.M.                                                                                    APPELLANT

v.

WARREN COUNTY DEPARTMENT OF CHILD                                    APPELLEES
PROTECTION SERVICES BY ANDREA A.
SANDERS, AND S.M.M., A MINOR, BY AND
THROUGH THEIR NEXT FRIEND, ANDREA A.
SANDERS AND MISSISSIPPI DEPARTMENT
OF CHILD PROTECTION SERVICES

| | |
|---|---|
| DATE OF JUDGMENT: | 07/30/2024 |
| TRIAL JUDGE: | HON. MARCIE TANNER SOUTHERLAND |
| COURT FROM WHICH APPEALED: | WARREN COUNTY YOUTH COURT |
| ATTORNEY FOR APPELLANT: | JERRY CAMPBELL |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KRISTI DUNCAN KENNEDY |
| | LINDSEY ETHERIDGE LAZINSKY |
| | BRANDON COLLIN SMITH |
| | KIMBERLY GOLDEN GORE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 03/31/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     J.M. appeals from a judgment of the Warren County Youth Court terminating his

parental rights on five different statutory grounds.  J.M. argues that substantial evidence does

not support the youth court's findings.  However, applying our limited, deferential standard

of review, we find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. S.M., a male child, was born in May 2022.[1] J.M. is S.M.'s father, and C.S. is his mother. J.M. was incarcerated shortly after S.M.'s birth.[2] On June 1, 2022, the Warren County Youth Court placed S.M. in the care and custody of the Mississippi Department of Child Protection Services (CPS). The youth court placed S.M. in CPS custody because the court had already adjudicated S.M.'s half-sister, N.S., to be a neglected child and placed N.S. in CPS custody due to, inter alia, drug use by C.S. and N.S.'s father.[3]

¶3. On June 10, 2022, J.M. signed a family service plan with the goal of reunification. The plan required that J.M. "obtain and maintain [a] suitable living [environment] for his child," "cooperate and submit to random drug screens," "submit to a drug assessment," "comply [with] and successfully attend parenting/anger management classes as scheduled at the CAP Center," "ensure that he can financially provide basic needs for his child," and "visit with his son at least twice monthly."

¶4. At an adjudication hearing in July 2022, the youth court adjudicated S.M. to be neglected. In a disposition hearing the same day, the court found that reunification with J.M. was in S.M.'s best interest and adopted a permanency plan requiring CPS to make reasonable efforts toward reunification. The court adopted a concurrent plan of custody with a relative.

---

[1] We use initials to protect the privacy of minors.

[2] J.M. was in custody for motor vehicle theft. Later, he was indicted in a separate case for possession of burglary tools. C.S. also faced multiple criminal charges and was in and out of jail in Warren County and Rankin County between the time S.M. was born and the final hearing in this case.

[3] N.S. was three years old and had been in CPS custody since August 2021. J.M. is not N.S.'s father, and N.S. is not at issue in this appeal. N.S.'s father died from injuries he sustained in a car wreck the day after N.S. was adjudicated to be a neglected child.

2

S.M. was placed in the care of N.S.'s foster parents.

¶5.     J.M. pled guilty to motor vehicle theft in September 2022 and was admitted to a drug court program.  In June 2023, the youth court held a permanency hearing.  C.S. tested positive for amphetamines and methamphetamine, while J.M. tested negative for drugs.  J.M. testified that he was going to help C.S. overcome her drug addiction, and he asked the court to give her more time.  The court adopted a permanency plan of terminating C.S.'s parental rights but ordered CPS to continue working with J.M. toward reunification.

¶6.     In October 2023, the court held a permanency hearing, and C.S. again tested positive for amphetamines and methamphetamine.  J.M. tested negative for drugs.  According to the court-appointed guardian ad litem (GAL), Leigh Ann Cade, J.M. had been warned that his continued association with C.S. could affect his participation in drug court and ability to get custody of his son.  However, J.M. "felt like he needed to support [C.S.]."  The youth court found that CPS had made reasonable efforts to assist J.M. in complying with this service plan and that J.M. had failed to comply.  Therefore, the court adopted a new permanency plan for S.M. of terminating J.M.'s parental rights and adoption, and the court directed CPS to initiate the process of filing a petition to terminate J.M.'s parental rights.

¶7.     In November 2023, CPS filed a petition to terminate J.M.'s and C.S.'s parental rights to S.M.[4]  The petition alleged that (1) S.M. had been adjudicated a neglected child; (2) S.M. had been in CPS's custody for at least six months; (3) the court had conducted a permanency hearing and determined that CPS had made reasonable efforts toward reunification, but the

_____

[4]  The petition also sought to terminate C.S.'s parental rights as to N.S.

3

parents had failed to substantially comply with their service plan; (4) terminating parental rights was in S.M.'s best interest; and (5) termination was justified on five distinct statutory grounds. *See* Miss. Code Ann. §§ 93-15-115, -119, & -121 (Rev. 2021). On March 20 and 22, 2024, the youth court held a hearing on the petition.

¶8. At the hearing, CPS social worker Nashova Richardson testified that J.M. had "completed a great deal" of his service plan. Richardson stated that J.M. had submitted to hair follicle drug testing, submitted to a drug assessment, completed an anger management class, and shown that he could financially meet S.M.'s basic needs. She stated that J.M. attended supervised visitations with S.M. "whenever he could get off from work," but she also testified that J.M. often attempted to visit too late at night or failed to show up to scheduled visits at all. Richardson testified that J.M. had obtained housing. However, Richardson had never been able to do a walk-through of the home because she had never been able to get in touch with J.M. to do a walk-through, and no one was ever at home when she visited the home. Accordingly, Richardson did not know whether the home was actually suitable for S.M.

¶9. Richardson testified that reunification between J.M. and S.M. was prevented by J.M. "maintaining a relationship with [C.S.]" because C.S. "continued to use drugs" while they continued to "liv[e] in the same home together." Richardson stated that J.M. had never had unsupervised visitation with S.M. or been alone with S.M., and this prevented them from forming any sort of parent-child relationship. Richardson testified that, in her opinion, J.M. was not willing or able to care for S.M., had not demonstrated a willingness to care for S.M.,

4

and had abandoned or deserted his duties to the child. She believed there had been a substantial erosion in the relationship between J.M. and S.M. due to J.M.'s insistence on continuing his relationship with C.S.

¶10. The GAL testified at the hearing that she believed J.M. was unwilling to provide a drug-free home for S.M. and that there was "a deep-seated erosion of the parent-child relationship" between J.M. and S.M. She attributed both issues to J.M.'s continued relationship with C.S. despite C.S.'s continued drug use. The GAL also testified that S.M.'s foster parents were the only parents he knew, and while J.M. "visited . . . for a few hours here or there," he had never visited S.M. alone or at his own house. She stated,

> [J.M.] has done most things but he has not done all he can do to build a relationship with his son. As [J.M.] stated[,] [he] does work a lot. He wasn't visiting as much as [S.M.'s foster parents] would [allow,] and then the ongoing drug use of [C.S.] and her residing [in his] home further hindered his ability of moving forward with building a relationship.

The GAL testified that "the biggest issue" was "the lack of a relationship" between J.M. and S.M., and she believed it was in S.M.'s best interests for the court to terminate J.M.'s parental rights.

¶11. S.M.'s foster mother, B.P., testified that S.M. had been in her care since S.M. was twelve days old.[5] B.P. stated that J.M. had visited S.M. about fifteen times from the time S.M. came into her care until the date of the termination of parental rights (TPR) hearing.[6]

---

[5] M.M. is S.M.'s and N.S.'s foster father. M.M. and B.P. are not married but have been in a relationship for ten years and have three biological children together. M.M. is N.S.'s uncle or cousin.

[6] M.M. later testified that he thought J.M. only visited five to ten times.

B.P. provided J.M. and C.S. their family's schedule, and they scheduled visitation in the evenings to allow J.M. and C.S. to be involved in parenting activities, such as baths and bedtime routines. B.P. testified that J.M. and C.S. initially visited S.M. during scheduled visitation times. However, J.M. and C.S. visited inconsistently and often "didn't show up when they were expected."

¶12. B.P. testified that J.M. had not visited S.M. in several months. J.M. attempted to visit S.M. in December 2023, but B.P. refused to allow visitation, testifying that J.M. and C.S. "wanted to bring Christmas presents and I told them that they needed to speak with the CPS worker." B.P. explained that J.M. and C.S. had not been "consistent and . . . hadn't seen the kids in quite a few months," and B.P. did not believe it was "okay to disrupt [the children's] life and just try to be a parent [for the] holidays." She did not believe such a visit would have been in S.M.'s best interest. B.P. testified that J.M. last tried to contact them in December. She also testified that she and M.M. were the only parents S.M. knew and that S.M. had a strong relationship with their biological children. She did not believe J.M. had satisfied his service agreement with CPS or that he would "be able to deal with the things that [S.M.] goes through," such as a likely autism diagnosis.

¶13. B.P. believed that J.M. and C.S. were still in a relationship at the time of the TPR hearing and that the children would not be safe with J.M. and C.S. B.P. testified that she had seen J.M. and C.S. together multiple times since J.M. claimed the relationship had ended. She testified that she saw J.M. visit C.S. in the hospital after C.S. was in a car wreck the month of the hearing. B.P. testified that she also saw J.M. and C.S. together at a grocery

store less than two weeks prior to the TPR hearing. Finally, she testified that in September 2023, J.M. told her that he and C.S. had made a "plan . . . to pretend not to be together" (i.e., to pretend that their relationship had ended) so that J.M. could get custody of S.M.

¶14. J.M. testified that he wanted custody of S.M. and did not want his parental rights to be terminated. J.M. maintained that he had completed his service plan to the best of his ability. He had been employed with a construction company for over one year and often worked seven days a week "by choice." He admitted that he missed visitation with S.M. because he was working out of town during scheduled visits. However, he told his boss that his "overtime" work would "ha[ve] to stop" if he obtained custody of S.M. He testified that he had completed eighteen of the twenty months of his drug court program and had not failed a drug test during the program.

¶15. J.M. testified that he lived in a trailer in Vicksburg and that the home was drug-free. He stated that C.S. had moved out of the trailer in January—about two months prior to the TPR hearing—and had not stayed overnight since.[7] He denied spending time with C.S., although he acknowledged visiting her briefly in the hospital after she was in a car wreck. He stated that C.S. was his "friend" and that he had "been with her for a long time." On cross-examination by the GAL, J.M. "[a]bsolutely" rejected the suggestion that his "ongoing relationship with [C.S.]" while she continued to use methamphetamine and fail drug tests had impacted his ability to build a relationship with his son.

¶16. J.M. admitted that S.M.'s foster parents had allowed visitation. He disputed B.P.'s

---

[7] C.S. stated that she had moved in with a male "roommate," who was "just a friend."

estimate that he had visited S.M. only fifteen times. J.M. estimated that he had visited S.M. forty-five to fifty times. He last visited S.M. in October 2023. He stated that it had been difficult to visit S.M. due to the many demands of his schedule, including out-of-town work and the requirements of drug court. He also pointed to the foster parents' refusal to allow visitation because N.S.'s visits with C.S. were causing emotional and behavioral issues with N.S.[8] J.M. primarily blamed S.M.'s foster parents and CPS for his lack of visitation with S.M. However, the GAL testified that B.P. and M.M. "really wanted to help the kids get home" to their parents. The GAL testified that "that is why [B.P.] set a schedule up" for J.M. and C.S. to visit and "opened her doors for them to visit as often as possible."

¶17. J.M. testified that he has another child who is five years old and is in the custody of the child's mother. J.M. stated that he has regular visitation with that child.

¶18. In July 2024, the youth court entered a final judgment terminating J.M.'s and C.S.'s parental rights with respect to S.M.[9] The court found by clear and convincing evidence that S.M. had been adjudicated as a neglected child; that he had been in CPS's custody for at least six months; that CPS had developed a service plan for reunifying S.M. with his parents; that CPS had made reasonable efforts for a reasonable period of time to diligently assist the parents in complying with their plan; and that J.M. and C.S. had failed to substantially

---

[8] Visitation with C.S. was negatively impacting N.S. because C.S. either would fail to show up or would show up but focus on S.M. and pay little attention to N.S. Notwithstanding this issue, J.M. could have continued visiting S.M. *without* C.S., but he generally failed to do so.

[9] The court entered a separate final judgment terminating C.S.'s parental rights with respect to N.S. That judgment is not at issue in this appeal.

comply with the plan. *See* Miss. Code Ann. § 93-15-115. The court also found by clear and convincing evidence that termination of J.M.'s parental rights was appropriate and that reunification was not desirable based on five statutory grounds: (1) that J.M. and C.S. had engaged in conduct constituting abandonment or desertion; (2) that J.M. and C.S. were mentally, morally, and otherwise unfit to raise S.M. based on past conduct that posed a substantial risk to S.M.'s safety and welfare; (3) that J.M. and C.S. were unable or unwilling to provide reasonably necessary care for S.M.; (4) that J.M. and C.S. had failed to exercise reasonable visitation with S.M.; and (5) that J.M.'s and C.S.'s neglectful conduct had caused, at least in part, a substantial erosion of their respective relationships with S.M. *See* Miss. Code Ann. § 93-15-115(d); *id.* § 93-15-119(1)(a); *id.* § 93-15-121(d)-(f).[10] Therefore, the court terminated J.M.'s and C.S.'s parental rights and ordered that custody of S.M. should continue with CPS with authority to consent to an adoption. J.M. filed a notice of appeal. C.S. did not appeal.

**ANALYSIS**

¶19. The youth court is authorized to terminate parental rights if the court finds by clear and convincing evidence that:

(a) The child has been adjudicated abused or neglected;

(b) The child has been in the custody and care of, or under the supervision of, [CPS] for at least six (6) months, and, in that time period, [CPS] has developed a service plan for the reunification of the parent and the child;

(c) A permanency hearing, or a permanency review hearing, has been

---

[10] The court also found that C.S. suffered from habitual drug addiction and had failed to successfully complete drug treatment. *See* Miss. Code Ann. § 93-15-121(c).

conducted . . . and the court has found that [CPS], or a licensed child caring agency under its supervision, has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the service plan but the parent has failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of the child; and

(d) Termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set out in Section 93-15-119 or 93-15-121.

Miss. Code Ann. § 93-15-115.

¶20.    Here, the youth court found that the requirements of section 93-15-115(a)-(d) were satisfied and that it was in S.M.'s best interest to terminate J.M.'s parental rights. On appeal, J.M. does not address or contest the youth court's findings that the TPR prerequisites listed in section 93-15-115(a)-(c) were satisfied. Rather, J.M. argues that substantial evidence does not support the youth court's findings that there was clear and convincing proof of five statutory grounds listed in sections 93-15-119 and -121. "Although the statutes provide several different reasons for termination, *only one statutory ground is needed to justify termination of parental rights*." *E.H. v. Lee Cnty. Dep't of Child Prot. Servs.*, 420 So. 3d 341, 351 (¶42) (Miss. Ct. App. 2025) (emphasis added); *accord Bullock v. Miss. Dep't of Child Prot. Servs.*, 343 So. 3d 1079, 1086 (¶22) (Miss. Ct. App. 2022); *W.A.S. v. A.L.G.*, 949 So. 2d 31, 35 (¶11) (Miss. 2007). Therefore, we will affirm the youth court's judgment if substantial evidence supports at least one ground found by the youth court.

¶21.    In reviewing the youth court's findings, we keep in mind that "this Court's standard of review is limited" in youth court cases. *In re S.A.M.*, 826 So. 2d 1266, 1274 (¶17) (Miss.

2002). The youth court's "findings of fact will not be overturned where they are supported by substantial evidence in the record, unless manifestly wrong." *Id.* This Court "asks not how we would have decided the case ab initio but whether there be credible proof from which a rational trier of fact may have found [grounds for termination] by clear and convincing evidence." *S.N.C. v. J.R.D. Jr.*, 755 So. 2d 1077, 1080 (¶7) (Miss. 2000) (other brackets omitted). "Even if this Court disagreed with the lower court on the finding of fact and might have arrived at a different conclusion, we are still bound by the judge's findings unless manifestly wrong." *S.F. v. Lamar Cnty. Dep't of Child Prot. Servs.*, 373 So. 3d 985, 987 (¶9) (Miss. 2023) (brackets and quotation marks omitted).

¶22. Here, as discussed above, S.M.'s foster mother, B.P., testified that J.M. had visited his son only about fifteen times during the approximately twenty-one months S.M. was in CPS custody prior to the TPR hearing. J.M.'s visitation was limited even though, according to both B.P. and the GAL, S.M.'s foster family tried to encourage as much visitation as possible. B.P. both set up a regular visitation schedule for J.M. and C.S. and generally "opened her doors for [J.M. and C.S.] to visit as often as possible." B.P. testified that she tried to set up a schedule of regular visits to allow J.M. and C.S. to participate in S.M.'s daily activities and care. B.P. testified that she also allowed J.M. and C.S. to visit on the rare occasions that they reached out for unscheduled visits, "even after [the children's] bedtime." Despite B.P.'s efforts to encourage visitation, she testified that J.M.'s visitation with S.M. was never anything but inconsistent and sporadic.

¶23. J.M. attributed his lack of visitation in part to his work schedule, stating that "by

11

choice" he typically worked six or seven days a week. J.M. testified that "an idle mind is the devil's workshop," so he tried to "stay busy" and work as much as possible. While J.M.'s employment was a positive development, he seemed to allow it to take precedence over visitation with his young son.

¶24. Moreover, the GAL and CPS social worker Richardson both testified that J.M. was never able to progress beyond supervised visits at the foster parents' home to overnight or unsupervised visitation at his own home because J.M. insisted on continuing his relationship with C.S., and C.S. continued to abuse drugs and engage in criminal activity. J.M. continued to maintain his relationship with C.S. even after he was warned that her continued drug use could prevent him from getting custody of his son. Indeed, B.P. testified that J.M. even said that he and C.S. planned to "pretend" to end their relationship so that the court would let him have custody of S.M. B.P. believed that J.M. and C.S. were still together at the time of the TPR hearing. Regardless, J.M. and C.S. claimed that C.S. finally moved out only *after* a petition to terminate their parental rights had already been filed.

¶25. We recognize that J.M.'s testimony and B.P.'s testimony were in conflict; however, J.M. offered no other evidence to refute B.P.'s testimony. In a TPR case, the youth court is the finder of fact and the judge of the witnesses' credibility, and we will not reverse the youth court's findings if there is "credible proof from which a rational trier of fact [could] have found [grounds for termination] by clear and convincing evidence." *S.N.C.*, 755 So. 2d at 1080 (¶7). As stated above, we are "bound by the judge's findings unless manifestly wrong" *even if we might have rendered a different decision based on the same evidence. S.F.*, 373

12

So. 3d at 987 (¶9) (brackets omitted).

¶26.    Applying our deferential standard of review, there is sufficient evidence to support the youth court's finding that J.M. failed to exercise reasonable visitation with his son.  There is evidence that because of J.M.'s own decisions and failure to exercise regular visitation, he saw his son only ten to fifteen times during the first twenty-one months of his son's life.  Moreover, J.M. has never been alone with his son, and this is due to J.M.'s unwillingness to provide a drug-free home for S.M. to visit.  Based on the evidence presented at trial, we cannot say that the youth court's finding that J.M. "failed to exercise reasonable visitation" was manifestly wrong.  Miss. Code Ann. § 93-15-121(e).  Therefore, we are bound to affirm the judgment of the youth court terminating J.M.'s parental rights.  Because there is sufficient evidence to support the youth court's decision on this ground, we need not address—and express no opinion on—the youth court's findings regarding other grounds.  *E.H.*, 420 So. 3d at 351 (¶42) ("Although the statutes provide several different reasons for termination, only one statutory ground is needed to justify termination of parental rights.").

¶27.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**